Creamer *v.* Twelve Common Pleas Judges et al.
Tate *v.* Jamieson et al.
O'Donnell *v.* Pitt, Jr.

486

Argued March 23, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused August 16, 1971.

*Israel Packel,* Counsel to Governor, for petitioner, Honorable J. Shane Creamer, Attorney General.

*Levy Anderson,* City Solicitor, with him *Matthew W. Bullock, Jr.,* First Deputy City Solicitor, and *John Mattioni,* Deputy City Solicitor, for petitioner, Honorable James H. J. Tate, Mayor of City of Philadelphia.

*William J. C. O'Donnell,* petitioner, in propria persona.

*Edward Friedman,* with him *Dechert, Price & Rhoads,* for respondents, Honorable Alexander F. Barbieri, Honorable Theodore O. Rogers, Honorable Warren G. Morgan, Honorable John C. Dowling, Honorable Thomas D. Gladden and Honorable Louis D. Stefan.

*Edward Friedman* and *I. Raymond Kremer,* for respondents, Honorable John E. Walsh, Jr., and Honorable Herbert W. Salus, Jr.

*Edward Friedman,* with him *Victor S. Jaczun,* for respondent, Honorable Robert M. Mountenay.

*Edward Friedman*, with him *Guy G. deFuria*, for respondents, Honorable Domenic D. Jerome and Honorable Robert A. Wright.

*Edward Friedman*, with him *Charles L. Casper*, for respondent, Honorable Robert H. Aston.

*James E. Beasley*, for respondent, Honorable Paul J. Cody.

*William H. Lamb*, with him *Susan P. Windle*, and *Lamb, Windle & McErlane*, for respondent, Honorable Thomas A. Pitts, Jr.

ORDER PER CURIAM, June 24, 1971:

The Court has unanimously determined that the gubernatorial appointments to judicial vacancies of Justice BARBIERI, Judge ROGERS, Judge SALUS, Judge STEFAN, Judge JEROME, Judge WRIGHT, Judge CODY and Judge GLADDEN were valid.

The Court being equally divided in its determination of the validity of the gubernatorial appointments of Judge MORGAN, Judge MOUNTENAY, Judge PITT, Judge DOWLING, Judge ASTON and Judge WALSH, the unexpected question presented is what action, if any, is to be taken. The principle is well established in this Commonwealth as well as many other jurisdictions that, when an appellate court is equally divided, the judgment, order or decree of the court below will be affirmed. *See*, 5B C.J.S., *Appeal & Error* §1844(b) (1958). However, in the cases at bar, this Court, by order dated March 11, 1971, with Mr. Justice ROBERTS dissenting, under its King's Bench power and under the Appellate Court Jurisdiction Act, Act of July 31, 1970, P. L. 673, Art. II, §205, 17 P.S. §§211, 205 (1971), assumed plenary jurisdiction without the previous adjudication of any other court. Accordingly,

there is no judgment, order or decree to affirm, modify or reverse.

Mr. Justice BARBIERI could not participate in the consideration or decision of these matters as his present position as an Associate Justice of this Court is contested herein.

In *First Congressional Dist. Election,* 295 Pa. 1, 144 Atl. 735 (1928), two election return judges were divided over the question whether certain ballot boxes should be opened. Before this Court on a writ of prohibition, it was pertinently stated: "When a legal or semi-legal tribunal consists of only two members, neither one of them can perform an affirmative act changing, or which may change, an existing condition; for it takes a majority of the whole body to do this, and one is not a majority of two. *It is a universal rule that when a judicial or semi-judicial body is equally divided, the subject-matter with which it is dealing must remain in status quo:* [citation omitted]." (Emphasis added.) 295 Pa. at 12-13. 144 Atl. at 739. *See, also, Summers v. Kramer,* 271 Pa. 189, 114 Atl. 525 (1921) ; *Madlem's Appeal,* 103 Pa. (7 Out.) 584 (1883). The rule is not different when this Court, exercising its King's Bench power and the authority vested in it under the Appellate Court Jurisdiction Act, is equally divided. Therefore, the requested relief cannot be granted.

---

OPINION BY MR. JUSTICE JONES, MR. JUSTICE EAGEN, AND MR. JUSTICE POMEROY IN SUPPORT OF PER CURIAM ORDER:

As a result of the opinion in opposition to the order, six common pleas judges, who have been performing judicial duties for many months, would be removed from office by reason of a highly technical and restricted reading of the Constitution of our Commonwealth. Such result would ignore both the rationale and wisdom of a prior decision of this Court as well as the

sound construction of a fairly similar constitutional provision in the United States Constitution by the federal courts.

The pivotal issue presented on these appeals is the validity of the gubernatorial appointments of fourteen judges and such validity, in turn, depends on *when* each vacancy in judicial office *occurred* in the constitutional sense. By choosing a date suspended in time, those in opposition to the order disserve the judiciary and make the validity of each appointment turn not on the merits of the appointees but on the fortuitous *first* date of the judicial vacancy. We would hold that the vacancy occurs not *only* on the *first* date but continues to occur until the vacancy is filled by gubernatorial appointment. Therefore, we believe all fourteen judges were validly appointed.

In construing the terms of the new Article V, §13 (b), of the Constitution, our starting point should, it seems to us, be the law as it was before the adoption of the new Article by the electorate on April 23, 1968. Prior to 1968, the appointive powers of the Governor were contained exclusively in Article IV, §8, of the Constitution. That Article provided in relevant part: ". . . [The Governor] may, during the recess of the Senate, fill vacancies happening in offices to which he appoints . . . and fill vacancies happening in . . . any . . . elective office he is authorized to fill. If the vacancy happens during the session of the Senate . . . he [the Governor] shall nominate to the Senate, before its final adjournment, a proper person to fill the vacancy."[1]

---

[1] This is the text in the relevant portions of Article IV, §8, as adopted by the electorate on May 16, 1967. The changes in the text of the 1874 Constitution were editorial only, except that the requirement of consent by two-thirds of the members of the Senate was confined to the Attorney General, the Superintendent of Public Instruction and such other officers as may be specified by law.

In *Commonwealth ex rel. Lafean v. Snyder,* 261 Pa. 57, 104 Atl. 494 (1918), this provision was construed to mean that a vacancy in an appointive office which first came into existence during a session of the Senate, but was not filled during the session, continued to exist or to "happen" after adjournment of the session, and so could be filled by appointment without senatorial confirmation; and this was so even though the appointee's name had been submitted to but specifically rejected by the Senate.[2]

With this the state of the applicable law, the Constitutional Convention of 1967-68 proposed, in accordance with the terms of its call (Act No. 2 of 1967), a new Judiciary Article, and this new article was adopted

---

[2] The appellants in *Lafean,* as the court there observed, did not contend "that the vacancy in question was one that had not 'happened' during the recess of the Senate, though it in fact arose while the Senate was in session. . . ." Though this threshold point was thus not in contention, the opinion makes it clear that a premise of the decision was that a vacancy did, in fact, exist after the Senate had odjourned. *Pritts v. Kuhl,* 51 N.J.L. 191, heavily relied on by the Court as "the only decision directly in point", was largely concerned with the meaning of the phrase "vacancy happening during the recess of the legislature", and held that a vacancy first occurring during a session continued into the recess period. Indeed, a literal reading of the statute which created the Pennsylvania Banking Department and was then in force, apart from Article IV, §8, of the 1874 Constitution, admitted no deviation from the required senatorial approval: "He [the Commissioner of Banking] shall be appointed by the Governor, by and with the advice and consent of the Senate, and shall hold his office for the term of four years and until his successor is duly qualified." Act of February 11, 1895, P. L. 4, §2.

Our Court followed the *Lafean* rationale in its recent opinion in *Ritenour v. Peirce,* 442 Pa. 1, 272 A. 2d 900 (1971), where, in an alternative ground for decision, it was held that under Article IV, §8, failure of the Senate to act on a nomination to fill a vacancy which first arose in the office of clerk of courts during the session of the Senate, did not prevent the Governor from filling the office by appointment after the Senate had adjourned.

by the electorate on April 23, 1968. This article, unlike its predecessor, included a section dealing with the filling of judicial vacancies, and a corresponding change was made in Article IV, §8, to make that section inapplicable to such vacancies. The new section, §13 (b), is as follows: "A vacancy in the office of justice, judge or justice of the peace shall be filled by appointment by the Governor. If the vacancy occurs during the session of the Senate, the appointment shall be with the advice and consent of two-thirds of the members elected to the Senate, except in the case of justices of the peace which shall be by a majority. If the vacancy occurs during sine die adjournment of the Senate such appointment shall not require the advice and consent of the Senate. The person so appointed shall serve for an initial term ending on the first Monday of January following the next municipal election more than ten months after the vacancy occurs."

During the session of the Senate which commenced on January 5, 1970, and terminated by adjournment on November 17, 1970, six judicial vacancies occurred in courts of common pleas of the Commonwealth, one each in January, February, March and April and two in September. The Governor filled these vacancies in December, when the Senate was not physically nor (as the entire Court agrees) technically in session.[3] As we have seen, under our constitutional law as it existed previous to 1968, these appointments would have been entirely within the Governor's power. The question, then, is whether the changes effectuated by the Constitutional Convention of 1967-68 deprived the Governor

---

[3] As the opinion in opposition to the order notes, the names of the two appointees to fill the vacancies which arose in January and February (Warren G. Morgan and Thomas A. Pitt, Jr., respectively) were submitted by the Governor to the Senate while it was in session, but no action was taken. The same persons were then appointed in December to fill the same vacancies.

of the power which, since the Constitution of 1838, he had had with respect to judicial appointments. This requires an examination of the verbal changes that the appointive provision of the new Article V (§13(b)) made in the appointive provision of Article IV (§8).

As reference to the above quoted portions of the relevant sections will show, the new provision substitutes the word "occurs" for the words "happening" and "happens". (It also substitutes the term "sine die adjournment" for the word "recess".) As we view them, these are basically editorial changes, not changes in substance, for "occur" and "happen" are universally recognized as synonymous.[4] Moreover, the use of the present tense implies a continuity or timelessness in the event or state of affairs being considered, as distinguished from a single event relating only to a definite moment in time.[5] Had the drafters wished to change the prior law, it would have been easy enough to interpose the word "first" before "occurs", or to have used a past tense form, such as "shall have occurred". A reading of the new Article V indicates that the draftsmen were incorporating into it substantially all provisions of the Constitution dealing with the judiciary, in what-

---

[4] The Random House Dictionary of the English Language (Unabridged) (1966) thus defines "occur": "1. To happen; take place; come to pass." The same dictionary defines "happen" in the same terms, *viz.*, "1. To take place; come to pass; occur." It also lists "occur" as a synonym of and often interchangeable with "happen", but as being more formal. To the same effect, *see* Webster's New International Dictionary of the English Language, Second Edition, Unabridged; Webster's New Dictionary of Synonyms (1968); Roget's International Thesaurus §151.3, p. 81 (1946).

[5] See the discussion of "present tense" in Evans, "A Dictionary of Contemporary American Usage," 389-90 (1957), where the authors state, *inter alia*, "This tense form is used in statements that are essentially timeless. . . ." This usage is accentuated, if anything, in the case of the word "occurs", which derives from the Latin word "occurrere," meaning "to run".

ever articles they formerly appeared. This motive of consolidation, coupled with minor editing, rather than the making of a major change in the relative powers of the executive and legislative branches of our government, appears to have been the purpose and intent in §13(b).[6]

Article II, Section 2, of the United States Constitution provides that the President ". . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, *Judges of the Supreme Court and all other Officers of the United States,* whose Appointments are not herein otherwise provided for, and which shall be established by Law. . . . The President shall have Power to fill up *all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.*" (Emphasis supplied.) In *United States v. Allocco,* 305 F. 2d 704 (2d Cir. 1962), *cert. denied,* 371 U.S. 964 (1963), this constitutional provision was construed. In that case the issue arose whether a federal district judge was validly appointed to fill a vacancy created by the resignation of an incumbent judge *after* the United States Senate had adjourned although the incumbent judge had resigned prior to recess of the Senate. Concluding that a vacancy *continues* to "happen" until it is filled, the Court noted, "[w]e believe that the Government's interpretation of Article II is reasonable, while the petitioner's (the approach adopted by the opinion in opposition) would create Executive paralysis and do violence to the orderly functioning of our complex govern-

---

[6] The call of the Constitutional Convention did not include consideration of Article IV, The Executive, wherein the appointive power of the Governor was set forth. It is noted that the Convention did reinstate the requirement that confirmation of judicial appointments be by two-thirds of the members of the Senate, which had been the requirement under Article IV, §8, until 1967.

ment." 305 F. 2d at 712. To semantically distinguish "happens" from "occurs" or to ignore this precedent concerning a similar provision contained in the federal constitution does "violence to the orderly functioning of our complex government."

Recent history has demonstrated that the Senate may, on occasion, hold up confirmation of judicial appointees. There are twenty-eight one-judge judicial districts in this Commonwealth—eight of which districts include two counties—and the possibility exists that any or all of these counties could be without judicial representation for prolonged periods if the Senate failed to confirm or even to act on the gubernatorial judicial nominations. Instead of recognizing the dire need for more judges, as evidenced by the numerous legislative proposals that have been recently introduced, the opposition view would lop off six judges. In this day and age, when our courts are faced with tremendous backlogs on both the criminal and civil sides of the courts, the prompt and expeditious filling of judicial vacancies is vital to the efficient operation of our judicial system. Those in opposition to the order, by their restricted and narrow interpretation of when a vacancy occurs, would not serve the public need in this respect.

Using a different approach, the Senate's function is not only to consent but to advise. Adopting the opposition's position, the Governor could appoint a man while the Senate is in session to fill a vacancy *first* occurring during the Senate's adjournment despite any contrary senatorial advice. To forestall any such possibility, the purpose of the Constitution's time division must be deemed to relate primarily to the availability of the Senate for consultation. When the instant appointments were made, the Senate was not available.

It has been argued that the interpretations we have reached places undue power in the hands of the Executive, which if misused could circumvent the power of

the Senate to advise and consent. Conversely, however, the opposition holding could be said to place undue power in the Senate, which if misused could circumvent the power of the Governor to appoint. These arguments were raised and answered by the Court in *Lafean*. Because of the wisdom and current validity of the Court's opinion on these aspects, we quote it at length. "A careful consideration of the argument and authorities cited by counsel for appellants fails to convince us that in framing the Constitution it was intended to limit by implication the choice of the governor in filling vacancies. It is of no avail to say that to permit the appointment of one who has been rejected for a full term would in effect enable the governor to evade the constitutional requirements. We cannot assume a public official will abuse his trust (Lane v. Commonwealth, supra), or act with a view to evade the duties of his office. The presumption is to the contrary: Mansel v. Nicely, 175 Pa. 375. In Fritts v. Kuhl, supra, it is said (page 205): 'The argument of those who deny the power, that it will tend to deprive the senate of their just participation in appointments to office, is not of controlling force. It is not logical to argue from an abuse of power to a negation of it. Every authority, however indispensable, may be the subject of abuse. Undoubtedly, the governor may abuse this, as he may any other power entrusted to him, but the argument is equally cogent, that the senate may arbitrarily refuse to consent to every nomination made by the governor, and leave him powerless to execute the laws, unless he will accede to its demands. The consequences likely to flow from a denial of the governor's power are much more to be [deprecated] than those that can result from conceding it." 261 Pa. at 67-68, 104 Atl. at 497.

In summary, the continual "vacancy" theory to which we adhere: (1) accords with the prior case law of both this Court and the federal courts; (2) elimi-

nates the possibility of prolonged judiciary vacancies; and (3) fully utilizes the Senate's advisory function *if* the Senate is available.

---

OPINION BY MR. CHIEF JUSTICE BELL SUPPORTING IN PART AND OPPOSING IN PART THE RESULTS ANNOUNCED IN THE PER CURIAM ORDER:

This Opinion covers all of the above-enumerated appeals. These appeals have been consolidated, but each one was orally argued before this Court with, of course, a separate brief in support of each party. They present a similarity of facts and the same principles of law, and consequently they will be considered together in this Opinion.

The question in these cases arose either by a writ of mandamus or by quo warranto or by petition to this Court to take original and plenary jurisdiction, which we granted. The different status of the parties or the form of relief sought, justified and made appropriate the form of action chosen by each party.

The petitioners, some of whom are taxpayers, raise the very important question of the *validity and Constitutionality of fourteen Judicial appointments* made by Governor Raymond P. Shafer to fill Judicial vacancies. Eight of these were appointed by Governor Shafer to fill eight Judicial *vacancies which occurred between November 20, 1970 and January 5, 1971, when the Senate was not in actual session. We shall first consider these eight appointments.*

Judge Alexander F. BARBIERI, formerly a Judge of the Court of Common Pleas of Philadelphia and subsequently a Judge of the Commonwealth Court of Pennsylvania, was appointed a Justice of the Supreme Court of Pennsylvania by Governor Shafer on *January 4, 1971,* and was duly sworn in on that date. This appointment was made *to fill the vacancy which occurred upon the death of* Justice Herbert B. COHEN, *on December 3,*

*1970*. Judge Herbert B. SALUS, JR., was appointed by Governor Shafer a Judge of the Court of Common Pleas, Philadelphia, on *November 29, 1970, to fill the vacancy* caused by the retirement of Judge Benjamin W. SCHWARTZ on *November 27, 1970*. Judge Louis D. STEFAN was appointed by Governor Shafer a Judge of the Court of Common Pleas, Montgomery County, on *December 9, 1970, to fill the vacancy* caused by the resignation of Judge J. William DITTER, JR., on *December 1, 1970*. Judge Domenic JEROME was appointed by Governor Shafer a Judge of the Court of Common Pleas, Delaware County, on *December 23, 1970, to fill the vacancy* caused by the retirement of Judge Henry G. SWENEY on *December 1, 1970*. Judge Robert A. WRIGHT was appointed by Governor Shafer a Judge of the Court of Common Pleas, Delaware County, on *December 23, 1970, to fill the vacancy* caused by the resignation of Judge James H. GORBEY on *December 23, 1970*. Judge Paul J. CODY was appointed by Governor Shafer a Judge of the Court of Common Pleas, Philadelphia, on *January 4, 1971, to fill the vacancy* created by the retirement of Judge Charles L. GUERIN on *January 4, 1971*. Judge Thomas D. GLADDEN was appointed by Governor Shafer a Judge of the Court of Common Pleas, Warren County, on *January 4, 1971, to fill the vacancy* caused by the resignation of Judge Barron P. McCUNE on *January 4, 1971*. Judge Theodore O. ROGERS* was appointed by Governor Shafer a Judge of the Commonwealth Court on *January 4, 1971, to fill the vacancy* caused by the resignation of Judge Alexander F. BARBIERI on *January 4, 1971*.

Petitioners contend, inter alia, (1) that the *"vacancy occurs"* on the *date of death or retirement or resignation of the incumbent Judge and does not continue until*

---

* Judge ROGERS's case will be hereinafter discussed at length in an accompanying Opinion.

*the vacancy is filled,* and (2) that there was *no sine die adjournment of the Senate,* since it was subject to reconvene at the call of the President pro tempore, *and consequently the Senate was still in session* when the appointments were made, and (3) even if there was a sine die adjournment, seven* of the eight vacancies occurred after the start of *a new Senate term* on December 1, 1970, but prior to the Senate's (swearing-in and its) Constitutionally-ordered *first session* on the first Tuesday of January 1971. For each and all of these reasons it is contended that the appointment by Governor Shafer of each of these new Judges *without Senatorial approval* was in violation of the Constitution and therefore invalid, because such appointments had to be made with the advice and consent of the Senate, which was never given.

We shall consider these contentions in their inverse order.

CONSTITUTIONALITY OF APPOINTMENTS

(a) Vacancies Occurring While the Senate Was
Not in Session

The Constitutionality of these appointments to a vacancy in a Judicial office is governed by Article V (the Judiciary Article), Section 13(a) and (b) of the Pennsylvania Constitution of 1968. The Constitution became effective (with a few irrelevant exceptions) on January 1, 1969, and pertinently provides:

"Election of Justices, Judges and Justices of the Peace; *Vacancies.***

"Section 13. (a) Justices, judges and justices of the peace shall be elected at the municipal election next preceding the commencement of their respective

---

* With the exception of Judge SALUS, who was appointed on November 29, 1970, to fill a vacancy which occurred on November 27, 1970.

** Italics throughout ours, unless otherwise noted.

terms of office by the electors of the Commonwealth or the respective districts in which they are to serve.

"(b) A *vacancy* in the office of justice, judge or justice of the peace *shall be filled by appointment by the Governor. If the vacancy occurs during the session of the Senate, the appointment shall be with the advice and consent of two-thirds of the members elected to the Senate,* except in the case of justices of the peace which shall be by a majority. *If the vacancy occurs during the sine die adjournment of the Senate such appointment shall not require the advice and consent of the Senate.* The person so appointed shall serve for an initial term ending on the first Monday of January following the next municipal election more than ten months after the vacancy occurs."

The first question is when did the *Judicial vacancy occur*—did it occur during a session of the Senate or during a *sine die adjournment* of the Senate? If the vacancy occurred during a sine die adjournment of the Senate, the Governor's appointment need not be submitted to the Senate; if the vacancy occurred *during a session of the Senate,* it would require the advice and consent of two-thirds of the Senate, and the Governor's appointments to such vacancies would be unconstitutional and invalid.

The Senate of Pennsylvania adjourned on *November 19, 1970.* The Legislative Journal of the Senate on November 19, 1970 states:

"Mr. STROUP: Mr. President, I move that the Senate do now *adjourn* to reconvene at the call of the President pro tempore.

"Mr. KLINE: Mr. President, I second the motion.

"The motion was agreed to.

"The Senate *adjourned*\* at 5:03 p.m., Eastern Standard Time."

---

\* The parties recite the following Resolution, which we cannot find in the record, but the difference is not material: "RESOLVED

The words "sine die" in the above-quoted provision of the Constitution mean a final adjournment, an adjournment without fixing a definite and specific day for their future meeting or assembly. See Black's Law Dictionary, Fourth Edition, page 1556. See also, to the same effect and in almost the same language, the following dictionaries, which define "sine die": "Without fixing a day for future action or meeting." The Random House Dictionary of the English Language, Copyright No. 1966: "Without day. b. when the court or other body rise at the end of a session or term, they adjourn sine die." 3 Bouvier's Law Dictionary, Third Revision, page 3075; Webster's New International Dictionary, Second Edition Unabridged; Roberts Rules of Order, Newly Revised, Chapter 4, Section 8, page 73. Perhaps it is best stated by the Supreme Court of Missouri in *State of Missouri et al. v. Atterbury et al.*, 300 S.W. 2d 806, where the Court stated (page 811) : "The term 'sine die' means 'without day' and a legislative body adjourns sine die when it adjourns 'without appointing a day on which to appear or assemble again.' "

*We therefore hold that the Senate adjourned sine die on November 19, 1970*, and the fact that the Senate "adjourned to reconvene at the call of the President pro tempore" does not change (as the protestors contend) the nature or finality of the adjournment. It therefore follows that each of the above-mentioned Gubernatorial appointments made to fill Judicial vacancies which occurred between November 20, 1970 and December 1, 1970 were validly and Constitutionally made and needed no Senatorial approval.

---

(the House of Representatitves concurring) that when the Senate adjourns this week, it reconvene at the call of the President Pro Tempore and when the House of Representatives adjourns this week, it reconvene to (sic) the call of the Speaker of the House of Representatives."

Was the new Senate in session during the period from December 1, 1970 to January 5, 1971, as the protestors contend?

The protestors rely upon Article II, Sections 1, 2, 3 and 4, and Article IV, Section 8.

Article II provides:

"Section 1. The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.

*"Election of Members; Vacancies.*

"Section 2. Members of the General Assembly shall be chosen at the *general* election every second year. *Their term of service shall begin on the first day of December next after their election. Whenever a vacancy shall occur in either House, the presiding officer thereof shall issue a writ of election to fill such vacancy for the remainder of the term.*

"Terms of Members

"Section 3. Senators shall be elected for the term of four years and Representatives for the term of two years.

"Sessions

"Section 4. The General Assembly shall be a continuing body during the term for which its Representatives are elected. *It shall meet* at twelve o'clock noon *on the first Tuesday of January each year. . . ."*

We believe Article II is inapplicable because (1) there is a difference between (a) *a term of service* and (b) a Session of the Legislature, and (2) it has a very different provision for filling a vacancy in the Senate and in the House than is specifically provided for filling a Judicial vacancy in and by the Judiciary Article, Article V, Section 13(b), which is hereinabove quoted at length.

This Court has unanimously decided that the Gubernatorial appointments to Judicial vacancies of Justice

BARBIERI, Judge ROGERS, Judge SALUS, Judge STEFAN, Judge JEROME, Judge WRIGHT, Judge CODY and Judge GLADDEN were (for differing reasons) valid and Constitutional.

With respect to the other Judicial appointments hereinabove mentioned, the Court is equally divided, as will be more fully hereinafter discussed.

In my judgment, the appointment by the Governor of the following persons to *Judicial vacancies, which occurred while the Senate was undoubtedly in session, were undoubtedly invalid,* because they clearly and unquestionably violated the clear and directly-controlling language of Section 13(b) of our present Constitution. Section 13(b), as above noted and quoted, mandates the Governor to submit his Judicial appointments to the Senate for its approval (advice and consent). Those who were appointed in violation of the clear mandate of the Constitution are: Judge Warren G. MORGAN, who was appointed a Judge of the Court of Common Pleas of Dauphin County on December 1, 1970, to fill the *vacancy* caused by the resignation of Judge R. Dixon HERMAN, on *January 5, 1970;* Judge Robert M. MOUNTENAY, who was appointed a Judge of the Court of Common Pleas of Bucks County on December 1, 1970, to fill the *vacancy* caused by the retirement of Judge Edward G. BIESTER, on *September 1, 1970;* Judge Thomas A. PITT, JR., who was appointed a Judge of the Court of Common Pleas of Chester County on December 1, 1970, to fill the *vacancy* caused by the death of Judge Thomas A. RILEY on *February 9, 1970;* Judge John C. DOWLING, who was appointed a Judge of the Court of Common Pleas of Dauphin County on December 3, 1970, to fill the *vacancy* caused by the resignation of Judge James S. BOWMAN on *April 15, 1970;* Judge Albert H. ASTON, who was appointed a Judge of the Court of Common Pleas of Luzerne County on December 17, 1970, to fill the *vacancy* caused by the

death of Judge Jacob SCHIFFMAN on *March 22, 1970;* and Judge John E. WALSH, JR., who was appointed a Judge of the Court of Common Pleas of Philadelphia, on December 29, 1970, to fill the *vacancy* caused by the resignation of Judge Joseph GOLD on *September 15, 1970.*

The Judiciary of Pennsylvania and the powers of a Governor and of a Senate with respect thereto are of such tremendous importance that we shall answer and refute at length the positions and contentions taken and made in the Opinion of Justices JONES, EAGEN and POMEROY. The clear language of Section 13 is grossly (although, of course, unintentionally) distorted by their misinterpretation thereof and their unrealistic and totally inapplicable examples which they give. They first attempt to support their interpretation by Article IV, Section 8, of the Constitution, which by its clear and specific language does not apply to Appellate Judges or other Judges, and by the prior Constitution of 1874 and the different language in the Federal Constitution and the practices thereunder.

Section 13(a) and (b) of our present Constitution changes the Constitution of 1874, as the opposing Justices admit, by changing (1) Article IV, Section 8, and (2) making it inapplicable to Judicial appointments. They contend, however, that the very important and very material changes made in and by Section 13 of our present Constitution were merely *"editorial"*, whereas the changes were almost as different as day is from night. They attempt to support their views by a Procrustean stretch of the English language and then attempt to further support their conclusions by unrealistic and totally irrelevant examples. They contend—and this is the most striking difference between our Opinion and theirs—that a vacancy *occurs* when a Judge dies or resigns and (1) *continues* to "occur" until the Governor appoints a person to fill that Judi-

cial office, and (2) the appointment need not be submitted to the Senate if the Senate is in *recess*—irrespective of whether the recess is for *an hour, or a day, or a weekend, or a few months.* In other words, a Governor can, at his will or whim, effectively nullify and obliterate the right and power of the Senate to confirm or reject his (the Governor's) Judicial appointments. This is so unrealistic as to be absurd.

The weakness of their position is further evident when they state that if the clear language and meaning of the Constitution is followed (as we do), we would "disserve the Judiciary and make the validity of each appointment turn not on the merits of the appointees but on the fortuitous first date of the Judicial vacancy." Only the imagination of a Jules Verne could justify such unrealistic reasoning. It is impossible to understand how our interpretation of Section 13, which requires Senate approval of a Judicial appointment in the case of certain vacancies, "works a disservice to the Judiciary" or how their interpretation *assures a merit* selection of Judicial appointees.

Moreover, their interpretation of Section 13 could be employed, I repeat, to frustrate totally the Constitutional mandate of Senate confirmation. Under their view, a Governor could always circumvent the need for Senate confirmation simply by scheduling his Judicial appointments when the Senate was in recess.

The opposing Justices start, as we have seen, with Article IV, Section 8, of the Constitution of 1874 and then attempt to relate it to the present Constitution of 1968. The present Constitution clearly and specifically provides, in Article IV, Section 8, for the appointment by the Governor to offices other than Judicial offices, and is clearly, obviously and unquestionably inapplicable to Judicial vacancies.

Furthermore, Article IV, Section 8, by its very terms, distinguishes between a *recess* and a *session* of

the Senate, and, even more importantly, it draws a clear line of distinction (I repeat) between appointments *for vacancies happening (a) in Judicial offices and (b) in offices other than Judicial offices.* Yet these very important distinctions are completely ignored by Justice JONES, Justice EAGEN and Justice POMEROY. The material and very important difference in language of Article V of the (present) Constitution from the language in Article IV, Section 8, distinguishes these Articles and also the prior Pennsylvania cases upon which they rely, which were decided under provisions *similar to Article IV* of the present Constitution, such as *Commonwealth ex rel. Lafean v. Snyder,* 261 Pa. 57, 104 Atl. 494, or under a statute providing for the appointment of a Court clerk in a second-class County, such as *Ritenour v. Peirce,* 442 Pa. 1, 272 A. 2d 900, Second Class County Code, Act of May 2, 1929, P. L. 1278.

In determining a Governor's power to appoint to a *vacancy* in a Judicial office which *occurs during a session* of the Senate, it is a well-settled principle that where words of a Constitution are plain, they should be given their popular or common meaning: *Breslow v. Baldwin Township School District,* 408 Pa. 121, 182 A. 2d 501.

The Constitution of 1968 made, and intentionally and deliberately made, many important changes in many of the provisions of the Constitution of 1874. The opposing Opinion attempts to support their conclusion by an allegedly similar Article in the Constitution of the United States.

In an attempt to bolster their first ignoring and later completely distorting the clear provisions of the Judiciary Article respecting a Governor's power of appointment to fill a Judicial vacancy during a sine die adjournment of the Senate, they contend that the important changes which the 1968 Constitution makes in

Judicial appointments are "editorial" changes only, and not changes in substance—thus, I repeat, ignoring and distorting the English language.

In a further attempt to bolster their Procrustean interpretation, they state that "[r]ecent history has demonstrated that the Senate may, on occasion, hold up confirmation of judicial appointees. . . . [T]he possibility exists that any or all of these [28 one-judge judicial districts in this Commonwealth] could be without judicial representation for prolonged periods if the Senate failed to confirm or even to act on the gubernatorial judicial nominations." By this boot-strap argument, they close their eyes to the fact which every Judge and every Legislator and nearly every person in Pennsylvania knows—that the Governor of Pennsylvania is equally if not more to blame than the Senate for holding up Judicial appointments, which causes tremendous and often very regrettable delays in the administration of Justice. Many, many examples could be cited to prove this fact, which is a matter of common knowledge, but two recent examples will suffice. In this very case, the Governor of Pennsylvania held up for a period of ten months the appointment of several Judges to fill Judicial vacancies.

Justices JONES, EAGEN and POMEROY compound their errors by relying upon Article II of the Constitution of the United States. This Article is substantially different from Section 13 of the Constitution of Pennsylvania. *Article II* of the Constitution of the United States provides:

"Of the President; The Executive Power

. . .

"Section 2. . . .

"3. The President shall have Power to fill up all vacancies that may happen during the *Recess* of the Senate, by granting Commissions, *which shall expire at the End of their next Session.*" Moreover, the powers

of a President of the United States and of a Governor of Pennsylvania are in some respects substantially and materially different. Under the Constitution of the United States and the relevant decisions interpreting its provisions, as well as the practice thereunder, the power of a President to fill a lower Court *Judicial vacancy that may happen during a recess* of the Senate is well established but is different and distinguishable from the power of appointment given to a Governor of Pennsylvania under our Constitution to fill a vacancy without Senate confirmation during a "sine die adjournment of the Senate."

To summarize: We would hold (1) that a *vacancy* in a Judicial office *occurs at the date* when the incumbent of a Judicial office actually dies (or resigns, or retires, or is removed, or his term of office ends), and *does not continue* to "occur" thereafter until the date of the Governor's appointment of a successor; (2) that the (1970) Senate adjourned sine die on November 19, 1970, at 5:03 p.m., Eastern Standard Time; and (3) that the Governor's appointments to fill the aforesaid eight Judicial vacancies which occurred after November 19, 1970 and prior to the Senate's *first session* on January 5, 1971 did not require the advice and consent of the Senate, and were therefore valid and Constitutional; and (4) that the Judicial appointments which were made by the Governor to positions where a vacancy occurred during a session of the Senate prior to November 19, 1970, without submitting the nominees to the Senate for its advice and consent, were invalid because they violated Section 13(b) of the Constitution of Pennsylvania.

Mr. Justice O'BRIEN and Mr. Justice ROBERTS join in this Opinion.

Mr. Justice BARBIERI took no part in the consideration or decision of these cases.