327 A.2d 623
Richard C. FRAME et al., Plaintiffs,
v.
Robert E. SUTHERLAND, Defendant.

Richard C. FRAME et al., Plaintiffs,
v.
Peter ELISH, Defendant.

Richard C. FRAME et al., Plaintiffs,
v.
Grace Shirley HATCH, Defendant.

Richard C. FRAME et al., Plaintiffs,
v.
Egidio CERELLI, Defendant.

Supreme Court of Pennsylvania.
Argued April 22, 1974.
Decided Oct. 25, 1974.
Rehearing Denied Nov. 21, 1974.

William E. Woodside, Edward Friedman, Harrisburg, for petitioners.

Israel Packel, Atty. Gen., Dept. of Justice, Lawrence J. Beaser, Counsel to the Governor, Harrisburg, for respondents.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, AND NIX, JJ.

## OPINION

ROBERTS, Justice.

We are presented with challenges to the validity of certain appointments made by the Governor without the consent of the Senate. We hold that, because the appointments were not made "during the recess of the Senate," they are invalid.

At 2:30 p. m. on December 31, 1973, the Pennsylvania Senate voted to adjourn its 1973 session. The adjournment resolution, adopted by a vote of 24–22, purported to adjourn the Senate sine die.[1] The resolution did not contemplate, provide for, or receive the consent of the House of Representatives. In fact, the House met and conducted business on December 31 and the morning of January 1, 1974. At noon that day, the one hundred fifty-seventh General Assembly expired and the one hundred fifty-eighth was mandated to begin.[2]

Several hours after the adjournment of the Senate, the Governor, pursuant to article IV, section 8(b) of the Constitution, made approximately 680 appointments, including defendants Grace Hatch as a member of the Civil Service Commission, Robert E. Sutherland as a member of the Pennsylvania Game Commission, Peter Elish as a member of the Milk Marketing Board, and Egidio Cerelli as a member of the Pennsylvania Turnpike Commission.

1. "[W]ithout assigning a day for a further meeting or hearing. Hence, a final adjournment."
 Black's Law Dictionary 1556 (rev. 4th ed. 1968).

2. Pa.Const. art. II, § 4:
 "The General Assembly . . . shall meet at twelve o'clock noon on the first Tuesday of January each year."

In January, 1974, plaintiffs, three members of the Senate, instituted these actions in quo warranto in the Commonwealth Court to test the rights of the named defendants to hold the offices to which they had been appointed on December 31. Plaintiffs also petitioned this Court to assume plenary jurisdiction of the matter;[3] we granted their petition on February 6, 1974, and heard argument on April 22, 1974.[4]

This controversy depends for its resolution on the construction of article IV, section 8 of our Constitution, which in pertinent part provides:

"(a) The Governor shall appoint an Attorney General, a Superintendent of Public Instruction and such other officers as he shall be authorized by law to appoint. The appointment of the Attorney General, the Superintendent of Public Instruction and of such other officers as may be specified by law, shall be subject to the consent of two-thirds of the members elected to the Senate.

"(b) Except as may now or hereafter be otherwise provided in this Constitution as to appellate and other judges, he may, during the recess of the Senate, fill vacancies happening in offices to which he appoints by granting commissions expiring at the end of its session . . . . . If the vacancy happens during the session of the Senate except as otherwise provided in this Constitution, he shall nominate to the Senate, before its final adjournment, a proper person to fill the vacancy."

The procedure established by section 8(a) is the submission of appointments to the Senate for the consent of two-thirds of its members. Section 8(b) creates an exception to that general rule, exempting certain appoint-

---

3. See Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 205, 17 P.S. § 211.205 (Supp.1974).

4. This case was assigned to the writer on October 1, 1974, for the purpose of preparing an opinion expressing the views of a majority of this Court.

ments from the requirement of senatorial confirmation. The Governor, it is provided, may fill vacancies in offices to which he appoints without submitting the appointments to the Senate by granting temporary[5] commissions "during the recess of the Senate." If the Senate is not in recess when the appointments are made, the general requirement of senatorial confirmation is applicable. That requirement is suspended only during "the recess of the Senate." Thus, the validity of an unconfirmed appointment depends on whether the Governor's power to issue temporary commissions was triggered by "the recess of the Senate."

■ The phrase "recess of the Senate" in this context does not include an interruption or break following a daily meeting. If it did, the Governor would have a choice in the appointment procedure he could utilize. Obviously, unless the Senate undertook 24-hour sittings, there would be a "recess of the Senate" for at least some period of time every day of the year when unconfirmed appointments could be made.

The relationship of the temporary appointment power and the permanent appointment power indicates, however, that the Governor is not to have that option. It is clear that the draftsmen preferred appointments be made by gubernatorial nomination-senatorial consent for traditional checks-and-balances purposes.[6] However, public

---

5. I. e., "commission expiring at the end of [the Senate's] session . . . ."

6. See The Federalist No. 76, at 494–95 (Modern Library ed. 1937) (A. Hamilton):

"To what purpose then require the co-operation of the Senate? I answer, that the necessity of their concurrence would have a powerful, though, in general, a silent operation. It would be an excellent check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters from State prejudice, from family connection, from personal attachment, or from a view to popularity. In addition to this, it would be an efficacious source of stability in the administration.

necessity might require a position be filled after the Senate had terminated its session, when the constitutionally preferred procedure could not be followed. To provide an appointment process for occasions when the preferred procedure is thus inadequate,[7] the Constitution permits the Governor to issue temporary commissions "during the recess of the Senate." The exception was designed for use only when the preferred procedure could not be employed. It follows that "recess of the Senate" must be limited to those periods of time when the Senate is unable to consent to appointments.

Inability to consent does not result from a break between one day's session and the next. Neither does it re-

"It will readily be comprehended, that a man who had himself the sole disposition of offices, would be governed much more by his private inclinations and interests, than when he was bound to submit the propriety of his choice to the discussion and determination of a different and independent body, and that body an entire branch of the legislature. The possibility of rejection would be a strong motive to care in proposing. The danger to his own reputation, and, in the case of an elective magistrate, to his political existence, from betraying a spirit of favoritism, or an unbecoming pursuit of popularity, to the observation of a body whose opinion would have great weight in forming that of the public, could not fail to operate as a barrier to the one and to the other. He would be both ashamed and afraid to bring forward, for the most distinguished or lucrative stations, candidates who had no other merit than that of coming from the same State to which he particularly belonged, or of being in some way or other personally allied to him, or of possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure."

7. See id. No. 67, at 439 (A. Hamilton):
"[The President's recess appointment power under U.S.Const. art. II, § 2, cl. 3 is] nothing more than a supplement to [his permanent appointment power under U.S.Const. art. II, § 2, cl. 2], for the purpose of establishing an auxiliary method of appointment, in cases to which the general method was inadequate. The ordinary power of appointment is confined to the President and Senate jointly, and can therefore only be exercised during the session of the Senate; but as it would have been improper to oblige this body to be continually in session for the appointment of officers, and as vacancies might happen in their recess, which it might be necessary for the public service to fill without delay, the succeeding clause is evidently intended to authorize the President, singly, to make temporary appointments 'during the recess of the Senate, by granting commissions which shall expire at the end of their next session.'" (original emphasis removed)

sult from a Friday-to-Monday interruption. Indeed, we are unable to say that any interruption during a session of the Senate renders the Senate unable to consent to appointments. Therefore, we conclude that "recess of the Senate" refers only to the final sine die adjournment at the end of the session.

This conclusion is consistent with our cases dealing with recess appointments. In *Stroup v. Kapleau*, 455 Pa. 171, 313 A.2d 237 (1973), the majority referred to the "final adjournment of the Senate" as the trigger which activates the temporary appointment power. In *Creamer v. Twelve Common Pleas Judges*, 443 Pa. 484, 493, 281 A.2d 57, 61 (1971) (Opinion in Support of the Per Curiam Order), three Justices, in comparing article IV, section 8 and article V, section 13, concluded that "recess of the Senate" and "sine die adjournment of the Senate" differed editorially only and not in substance and interpreted both to mean final adjournment. *Ritenour v. Peirce*, 442 Pa. 1, 10, 272 A.2d 900, 905 (1971), also recognized final adjournment as the circumstance which suspended the senatorial-confirmation requirement.

Therefore, only if the Senate had finally adjourned on the afternoon of December 31, 1973, a "recess of the Senate" existed which activated the Governor's power to issue temporary commissions and the appointments of defendants are valid. If the Senate had not finally adjourned, the requirement of senatorial confirmation was not suspended by a "recess of the Senate" and the appointments are invalid. Thus, the narrow question for decision is whether the Senate's unilateral adjournment on December 31 was a final adjournment.

■ We hold that the Senate's attempt to adjourn sine die failed because of the absence of consent by the House of Representatives. Our holding rests on a conclusion that the Constitution prohibits either house from adjourning sine die without the consent of the other.

The entire constitutional scheme is clearly predicated on the assumption that adjournment may not be a unilateral act on the part of one of the houses of the General Assembly. Article III, section 9 provides:

"Every order, resolution or vote, to which the concurrence of both Houses may be necessary, except on the question of adjournment, shall be presented to the Governor . . . ."

Article IV, section 12 states:

"[The Governor] may, on extraordinary occasions, convene the General Assembly, and in case of disagreement between the two Houses, with respect to the time of adjournment, adjourn them to such time as he shall think proper . . . ."

The exclusion of adjournment resolutions from article III, section 9 and the provision for adjournment by the Governor in article IV, section 12 would be utterly superfluous if the Constitution did not contemplate that adjournment of a house of the General Assembly required the consent of the other house.

The reason of policy for this requirement is not difficult to discern. Because each house is powerless to enact legislation alone,[8] each has a strong interest in insuring that bills passed by it are considered by the other house. The greatest threat to this interest is the possibility that the other house might adjourn, thus disabling itself from the consideration of bills. Protection against this possibility is provided each house by the Constitution in the form of a power to refuse to consent to the adjournment of the other house.

An exception to the consent requirement demonstrates that protection of each house's interest in the consideration of its bills by the other is its underlying policy. Article II, section 14 states:

"Neither House shall, without the consent of the other, adjourn for more than three days . . . ."

8. Pa.Const. art. III, § 4.

The draftsmen foresaw that protection of the interest of each house in having its bills considered by the other, if unqualified, would be gained at the expense of flexibility in the administration of the legislative calendar. Accordingly, the Constitution provides an exception to the consent requirement for adjournments of less than four days. This exception clearly reflects the perception that adjournments of less than four days present a minimal threat to each house's interest in the consideration by the other of its bills.

Defendants argue that the Senate's adjournment in this case was effective despite the absence of the consent of the House of Representatives under article II, section 14 because its duration was not more than three days. We disagree. Sine die adjournments are vastly different from the short recesses envisioned by article II, section 14 in two important respects. First, article II, section 14, as pointed out above, was designed to provide flexibility in the legislative calendar. However, sine die adjournments are unrelated to flexibility in the calendar, representing as they do the end of the legislative calendar for the session. Because the purpose of the exception to the consent requirement would not be served by its application to sine die adjournments, we conclude that the Constitution does not intend its application. Hence, section 14 does not expand the power of the Governor to make unconfirmed appointments.

Second, at the time the consent exception was inserted into the Constitution, a sine die adjournment by one house posed a far more drastic threat to the interests of the other than a short recess contemplated by article II, section 14. Recesses of less than four days pose a minimal danger that one house will so absent itself as to disable it from consideration of legislation. However, at the time the consent requirement and the three-day exception were inserted in the Constitution, a sine die adjournment represented the greatest threat to the interests of the

other house. This was so because unenacted bills pending at the end of a session expired,[9] requiring reintroduction and repassage of the bill in the originating house in order to obtain consideration by the other house. The absence of one house prevented legislation initiated by the other from ever being enacted into law. Accordingly, in contrast to a three-day intra-session recess, a sine die adjournment by one house was the ultimate threat to the interest in having the bills of the other enacted.

It is true that, since the constitutional amendment of 1967, a sine die adjournment at the end of a session does not terminate all then-pending business. Article II, section 4 now provides that "The General Assembly shall be a continuing body during the term for which its Representatives are elected." But there is no evidence that suggests that the change in article II, section 4 was intended to affect the consent requirement or the inapplicability of the three-day exception.

 Nothing in our prior cases dealing with the recess appointment power of the Governor suggests that that power is triggered by a unilateral adjournment of the Senate. In fact, a conclusion that a unilateral adjournment is sufficient would be an unwarranted and constitutionally impermissible extension of our decisions. In those cases, it is clear that the respective recesses of the Senate had been consented to by the House of Representatives; see *Stroup v. Kapleau,* 455 Pa. 171, 173, 313 A.2d 237, 238 (1973) ; *Creamer v. Twelve Common Pleas Judges,* 443 Pa. 484, 500–501 n. *, 281 A.2d 57, 65 n. 4 (1971) (Opinion Supporting in Part and Opposing in

**9.** "A motion to adjourn sine die has the effect of closing the session and terminating all unfinished business before the House, and all legislation pending upon adjournment sine die expires with the session, while a motion to adjourn from day to day does not destroy the continuity of a session and unfinished business simply takes its place on the calendar of the succeeding day."
P. Mason, Manual of Legislative Procedure § 445(3), at 301 (1970); see Rules of the Senate of Pennsylvania, rule XXVIII.

Part the Per Curiam Order) ; *Ritenour v. Peirce*, 442 Pa. 1, 4 n. 5, 272 A.2d 900, 902 n. 5 (1971). Our discussion in *Stroup* at 183, 313 A.2d at 243, assumed that House consent was in fact necessary for final adjournment of the Senate.

In summary, we hold that the consent of the House of Representatives is a prerequisite for a valid final adjournment of the Senate. Since it was not obtained in this instance, there was no "recess of the Senate" within the meaning of article IV, section 8. Therefore, the recess appointment power under section 8(b) was not operative. Because defendants' appointments were not submitted to the Senate for its consent as required by section 8(a), their appointments are invalid.

Judgments of quo warranto are entered, declaring the defendants are unlawfully holding the offices which they occupy and they are accordingly ousted and excluded therefrom.[10]

MANDERINO, J., took no part in the consideration or decision of this case.

NIX, J., filed a dissenting opinion.

POMEROY, J., concurs in the result.

EAGEN, J., dissents.

NIX, Justice (dissenting).

The *only* issue raised in this appeal which had not been decided in our most recent decision of *Stroup v. Kapleau,* 455 Pa. 171, 313 A.2d 237 (1973) was the effect of the Senate's adjournment, without the concurrence of the House, upon the gubernatorial power of temporary appointment. Ignoring the clearly defined issue to be decided, the majority seized upon this opportunity to establish principles that have in the past been consistently re-

10. See Act of June 14, 1836, P.L. 621, § 11, 12 P.S. § 2031 (1967).

pudiated and reached a conclusion contrary to precedent and violative of the language and the spirit of the Constitution of this Commonwealth. I therefore dissent.

The majority opinion is prefaced upon the view that the draftsmen of our Constitution expressed a preference that appointments "be made by gubernatorial nomination-senatorial consent for traditional checks-and-balances purposes"[1]. Proceeding from this point, the majority then reasoned that: "The exception [the temporary appointive power] was designed for use only when the preferred procedure could not be employed." This same premise formed the basis of the dissenting opinion by Mr. Chief Justice Brown in *Commonwealth ex rel. Lafean v. Snyder et al.*, 261 Pa. 57, 69–72, 104 A. 494, 497 (1918). The majority of the Court, however, expressed its unwillingness to find an intention in the language of the 1874 Constitution that a preference should be given to appointment by advice and consent.[2] In *Ritenour v. Peirce*, 442 Pa. 1, 272 A.2d 900 (1971), this Court, in an alternative ground for decision, applied the *Lafean* rationale to article IV, section 8 which is presently under consideration. There the Court stated:

". . . appellant argues, the Governor had the power to make an appointment only with Senatorial confirmation. We do not agree; the appointment here challenged was valid even if Article IV is applicable, . . . . The Governor did nominate a person to fill the Barrett vacancy before the Senate's adjournment; the Senate took no action in the following nine

1. I am completely at a loss to understand the reference in the majority opinion to the views of Alexander Hamilton, expressed in the Federalist Papers, as being germane to the question of the intent of the framers of the 1967 Amendment of the Pennsylvania Constitution and the will of the people of this state when they approved this Amendment.

2. In *Lafean* the majority held that the rejection by the Senate of a nomination by the Governor did not prevent the Governor from appointing the rejected nominee to the same office under his temporary appointive power.

months prior to its adjournment; during the ensuing recess of the Senate the Governor made the appointment. In so doing he did all that he was required to do under Article IV, Section 8, and there is no indication in the Constitution that non-action by the Senate while it is in session operates to foreclose the Governor from exercising the right, granted by the same constitutional section, to appoint during the recess of the Senate." Id. at 10, 272 A.2d at 905.

Again rejecting the suggestion that appointment with the advice and consent of the Senate should be favored, three Justices in an Opinion in Support of a Per Curiam Order in *Creamer v. Twelve Common Pleas Judges et al.,* 443 Pa. 484, 495–96, 281 A.2d 57, 62 (1971) reasoned:

"It has been argued that the interpretations we have reached places undue power in the hands of the Executive, which if misused could circumvent the power of the Senate to advise and consent. Conversely, however, the opposition holding could be said to place undue power in the Senate, which if misused could circumvent the power of the Governor to appoint. These arguments were raised and answered by the Court in *Lafean.* Because of the wisdom and current validity of the Court's opinion on these aspects, we quote it at length." [3]

Most recently in *Stroup v. Kapleau, supra,* we observed:

"The phrase, *during the recess of the Senate,* now only tells us when the Governor may temporarily appoint —not when the vacancy must occur. This change thus strengthens the conclusion in *Lafean,* that the executive authority to make *temporary* appointments is distinct and separate from his authority to make *perma-*

**3.** While the Court in the *Creamer* decision, *supra,* was primarily concerned with an interpretation of article V, section 13, it nevertheless recognized that the same considerations were involved as in an interpretation of article IV, section 8.

*nent* appoints requiring Senate confirmation." (Emphasis in original text). Id. 455 Pa. at 179–180, 313 A.2d at 241.

At another point in the *Stroup* decision the Court stated:

"We conclude that the Governor has the power to make temporary recess appointments whether or not he has submitted, for the Senate's approval, a nominee for permanent appointment. If, as the appellant Senators have argued, the executive authority to make temporary appointments should be limited, *it is for the people, not this Court, to amend the Constitution of Pennsylvania.*" (Emphasis added). Id. at 181, 313 A.2d at 242.

This writer also had occasion to set forth reasons for rejecting the theory that there was an underlying intention that appointment by advice and consent of Senate should be given preference. Because those views remain unaltered, I will repeat them here:

"To argue that today's result vests within the Governor 'the power to whimsically and continually circumvent the constitutional requirement of Senate advice and consent' is to ignore that this Court as early as 1918 allowed the recess appointive power to be used to fill a vacancy *first* happening while the Senate was in session. (Citation omitted). The circumvention of Senate approval of which the dissent now complains was fully accomplished when the *Lafean* Court rendered the Senate's power of dissent impotent.

· · · · · · · ·

That opinion clearly expressed its refusal to find an intention in the language of the 1874 section of the dominance of appointment by advice and consent that would justify a restriction upon the recess appointment by implication.

· · · · · · · ·

If we were faced with only a reconsideration of the earlier judicial interpretation of this constitutional

provision, I would have grave difficulty in reaching the result of the *Lafean* Court and those cases which followed. But it must be remembered that our task is not the reassessment of prior judicial interpretations but rather an interpretation of the will of the people of this Commonwealth as expressed in the 1967 Amendment to the Constitution of this State. *In searching for the true intent of the document the Court's theory of government must be subservient to the expressed will of the people. The prior interpretation of the former 1874 section, the adoption of the present section without significant change forces the conclusion that the intention was to construe the section in accordance with the principles announced by Lafean. To attempt now to ignore this public mandate would be judicial over-reaching of the most offensive nature.*" (Emphasis added) *Stroup v. Kapleau*, 455 Pa. 171, 313 A.2d at 247. (Concurring Opinion—Nix, J.)

The majority opinion, without explanation as to why former precedent should cease to be controlling or justification for now embracing a premise consistently repudiated in the past, predicates the conclusion reached today upon its view that the authority to issue temporary commissions only exists when the preferred procedure (appointment with the advice and consent of Senate) cannot be employed. This flagrant abandonment of "stare decisis", without the slightest acknowledgment of the departure and absent any attempt to demonstrate its need, cannot be condoned and epitomizes the height of judicial irresponsibility.

Viewing, as I think we must, article IV, section 8 as creating two separate and distinct powers of appointment, we are compelled to conclude that a unilateral adjournment of the Senate does not prevent the exercise of the temporary recess appointment.

Article IV, section 8 provides:

"Section 8(a) The Governor shall appoint an Attorney General, a Superintendent of Public Instruction and such other officers as he shall be authorized by law to appoint. The appointment of the Attorney General, the Superintendent of Public Instruction and of such other officers as may be specified by law, shall be subject to the consent of two-thirds of the members elected to the Senate.

(b) Except as may now or hereafter be otherwise provided in this Constitution as to appellate and other judges, he may, during the recess of the Senate, fill vacancies happening in offices to which he appoints by granting commissions expiring at the end of its session and fill vacancies happening in the office of the Auditor General or State Treasurer or in any other elective office he is authorized to fill. If the vacancy happens during the session of the Senate except as otherwise provided in this Constitution, he shall nominate to the Senate, before its final adjournment, a proper person to fill the vacancy . . ."

While it is apparent that the phrase "recess of the Senate" in subsection (b) encompasses something more than the normal parliamentary parlance referring merely to an interruption or break in a daily meeting, I cannot accept the majority's view that it refers to a "sine die" adjournment. By definition a "sine die" adjournment is the termination of the life of the legislative body then existing.[4] Under article II, section 4[5] which provides

---

4. "Section 445 Motion to Adjourn Sine Die.
3. A motion to adjourn sine die has the effect of closing the session and terminating all unfinished business before the House, and all legislation pending upon adjournment sine die expires with the session, while a motion to adjourn from day to day does not destroy the continuity of a session and unfinished business simply takes its place on the calendar of the succeeding day." Mason's Manual of Legislative Procedure, §

5. See note 5 on page 193.

for a continuing body during the elective term of members of the House of Representatives, a "sine die" adjournment may only occur at the end of the mandated session during the even-numbered years. Thus, accepting the reasoning of the majority that "recess of the Senate" in article IV, section 8(b) is limited to a "sine die" adjournment is totally inconsistent with our holding in *Stroup* where we sustained temporary recess appointments made at the close of a session during an odd-numbered year.[6]

The majority has properly noted that the framers of article IV, section 8 used the term "final adjournment" when they intended to refer to a "sine die" adjournment. However, it is most persuasive that although they did employ the term "final adjournment" in subsection (b), when designating the time within which the Governor must submit a name for Senate approval it did not do so when indicating the period during which the temporary appointive power was effective. The use of the term "final adjournment" in one instance and reference to "recess" in the other in the same subsection forces the conclusion that there was an intention to refer to a different period of time. I am forced to reaffirm our conclusion in *Stroup* that "recess in the Senate" refers to that period following the termination of the mandated yearly sessions. See article II, section 4.

445 at 301 (1970); See also *Brown v. Brancato*, 321 Pa. 54, 62, 184 A. 89, 92–93 (1936).
"No power is vested in the House to act independently of the Senate after the Assembly adjourns sine die. . . . . The legislative action of the General Assembly, in virtue of the session which convened, . . ., ended with its adjournment."

5. Article II, Section 4 provides:
The General Assembly shall be a continuing body during the term for which its Representatives are elected. It shall meet at twelve o'clock noon on the first Tuesday of January each year.

6. The appointments in *Stroup v. Kapleau, supra* were made after the General Assembly adjourned on December 28, 1971.

We now turn to the only issue in my judgment left unresolved by our decision in *Stroup*. May the Senate by unilateral action terminate its annual session? The only express constitutional limitation placed upon the recess power of either House is article II, section 14 which provides:

> "Neither House shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which the two Houses shall be sitting."

The language of article II, section 14 in no way suggests that a final adjournment of an annual session of one of the Houses cannot be effectuated without concurrence of the other, provided however that the adjournment complies with the provisions of that section. Further, the plaintiffs concede that at least in one instance the framers of the Constitution contemplated a unilateral final adjournment by the Senate without the concurrence of the House of Representatives where under article IV, section 12 the Governor convenes the Senate "in extraordinary session by proclamation for the transaction of executive business."

Equally as compelling is that a careful reading of the Constitution establishes that throughout the framers of the document used the term "Senate" only when it was meant to refer to *that body*. We have found not one instance where "Senate" was used either as a synonym for "General Assembly" or "House of Representatives".

Under our Constitution, participation in the appointment process is vested exclusively in the Senate and the Governor. It is significant that under no circumstances is the approval, concurrence or joint action of the House of Representatives provided for or required. The right of the Governor to validly exercise his temporary power of appointment is not dependent upon the status of the House but rather of the Senate. Thus, the specific refer-

ence to a recess of the Senate in article IV, section 8(b) was not fortuitousness but quite in keeping with the constitutional scheme for the exercise of the power.

We are not impressed with the argument that since the beginning of annual legislative sessions in Pennsylvania, the General Assembly has consistently adopted concurrent resolutions for sine die adjournment regardless of the proximity of the next succeeding session. The fact that a body does not elect to use a particular power is not impressive evidence that the body does not possess that power, particularly in absence of a showing of circumstances that would have provided a compelling need for the exercise of the power in question.

Here, in conformity with article II, section 14 the Senate declared a recess which in effect was a final adjournment of the annual session because of the expiration of the life of the session by virtue of article II, section 4. To attempt to distinguish this recess from one resulting from joint action would create a distinction without meaning and wholly unsupported by the language and clear intention of the Constitution. As the majority of this Court observed in *Stroup, supra* at 177, 313 A.2d at 240:

> "In the face of constitutional challenges we have frequently said that the legislative acts of the legislative branch, the General Assembly, in which the supreme legislative power is vested (article II, section 1), are to be presumed constitutional unless clearly shown to be otherwise."

Under article II, section 14, a new session was mandated to commence at 12 o'clock noon on Tuesday, January 1, 1974. Necessarily, the former session would have legally expired at 11:59 A.M. on that date. Therefore the action taken by the Senate in recessing on December 31, 1973 fulfills the requirement of article II, section 14 in that it was a recess of less than three days. To conclude that this recess did not in fact terminate the annual ses-

sion is contrary to fact, and the majority's attempt to describe it as something less than a termination of an annual session is, in my judgment, completely without foundation.

I would therefore hold that the defendants are legally entitled to the offices for which they have been appointed and that the complaints should be dismissed.