UNITED STATES of America

v.

David M. GRIGGS, a/k/a David Briggs, a/k/a David Greggs, a/k/a James Brook, a/k/a David Drummond, and Eric Spencer Saunders, a/k/a Eric Spencer, Defendants.

No. 4:CR–00–0072.

United States District Court, M.D. Pennsylvania.

Sept. 15, 2000.

John J. McCann, Assistant United States Attorney, United States Attorney's Office, Williamsport, PA, Counsel for the government.

D. Toni Byrd, Assistant Federal Public Defender, Williamsport, PA, Counsel for defendant Saunders.

Douglas B. Chester, Spring Mills, PA, Counsel for defendant Griggs.

## *MEMORANDUM*

McCLURE, District Judge.

### *BACKGROUND:*

On March 8, 2000, a grand jury sitting in the Middle District of Pennsylvania returned an indictment charging defendants David M. Griggs and Eric Spencer Saunders with possession with intent to distribute in excess of 50 grams of cocaine base (crack cocaine), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii). Both defendants entered pleas of not guilty at arraignment, on March 29, 2000 (Griggs), and April 11, 2000 (Saunders). Jury selection currently is scheduled for October 2, 2000.

Before the court is a motion by Saunders to suppress evidence, in which Griggs has joined. An evidentiary hearing on the

motion was conducted on August 11, 2000, involving both defendants. Defendants were granted additional time for supplemental briefing and the government given leave to respond. Defendants' supplemental briefs have been filed, and we find no need to await a further response from the government. We address the motion as applicable to both defendants.

## DISCUSSION:

### I. FINDINGS OF FACT

The court makes the following findings of fact and reaches the conclusions of law set forth in Section V, below, for purposes of disposition of the motion to suppress, there being no "good cause" to defer ruling on the motion until trial. Fed. R.Crim.P. 12(e). The findings of fact and conclusions of law are recited herein pursuant to the same Rule.

1. On February 29, 2000, Corporal Terrance Jankouskas of the Pennsylvania State Police (PSP) was patrolling in a canine unit/cruiser on Interstate Highway 80 in northeast Pennsylvania.

2. At approximately 9:15 p.m., Jankouskas was traveling in the left-hand lane westbound on I–80 in Butler Township, Luzerne County.

3. Jankouskas was traveling faster than other traffic.

4. Jankouskas caught up to a silver Mercury Cougar with an older-style (blue with gold lettering) Pennsylvania license plate and a temporary registration sticker, consisting of a white, $1'' \times 1''$ sticker with a red "T."

5. Because the plate was older, as indicated by the style and the series of letters at the beginning of the license plate number, and had a "T" sticker, Jankouskas' attention was drawn to the vehicle and he followed it.

6. In a space of approximately 1½ miles, the Cougar left its lane of travel, crossed the solid white line on the right side of the road, and drove along the berm of the highway three times.

7. Trooper Jankouskas stopped the vehicle due to the swerving and because of the "T" sticker, and not for speeding or any other traffic violation.

8. The Cougar was not the subject of any investigation prior to the vehicle stop by Jankouskas.

9. The Cougar was stopped between the Interstate Highway 81 overpass and the entrance ramp from I–81, which would be just to the west of the I–81 overpass.

10. Jankouskas approached the Cougar on the driver's side and asked the driver for his license and the vehicle registration.

11. Inside the vehicle were two people, both Black males; Jankouskas is White.

12. Before stopping the vehicle, Jankouskas could tell that there were at least two people in the car, but could not identify any physical characteristics, and could not tell if there were more people in the car.

13. The driver patted his pockets as though looking for a wallet while the passenger looked in the glove compartment.

14. Jankauskas asked the driver to exit the vehicle, and was handed a vehicle registration card by the passenger.

15. The vehicle registration card was for a Cadillac, not a Mercury.

16. The driver told Jankauskas that his name was Eric Spencer and gave a date of birth of March 19, 1953, but indicated that he had forgotten his wallet.

17. When asked about the "T" sticker and the swerving, the driver stated that the car belonged to the passenger and that he was driving because the passenger could not drive at night.

18. When asked about their destination, the driver stated that they had gone to Philadelphia to shop and to get some food, and had been there about two hours.

19. During this conversation, the driver appeared very nervous to Jankouskas.

20. After stating that they had been shopping, the driver approached the trunk

of the Cougar and stated that he would show Jankouskas what they had bought.

21. Jankouskas declined to look in the trunk and went to question the passenger.

22. The passenger handed Jankouskas a Pennsylvania driver's license (with a photograph) which identified the passenger as David Milton Griggs.

23. Griggs indicated that he was the owner of the vehicle.

24. Griggs identified the driver as Eric Saunders and stated that he does not drive at night due to his vision.

25. Griggs stated that they had gone to Philadelphia to visit family and had been there about five hours.

26. Griggs also appeared extremely nervous to Jankouskas.

27. Griggs returned to his vehicle to check Griggs' license and vehicle registration.

28. While in his vehicle, Jankouskas wrote a warning for the driver, stating the correct name of Eric Spencer Saunders.

29. When PSP Trooper Rossi arrived as backup, Jankouskas asked Saunders to exit the vehicle a second time and confronted him with the conflicting names.

30. Saunders then admitted to the correct name and provided the correct date of birth, March 19, 1953, and was given the written warning by Jankouskas.

31. Saunders also admitted that his license had been suspended.

32. When he gave Saunders the warning, Jankouskas asked if there was anything illegal in the car.

33. Saunders responded in the negative and went again to the trunk, telling Jankouskas that he could look.

34. Jankouskas declined and instead asked Saunders for consent to search the vehicle.

35. Jankouskas showed Saunders a consent-to-search form, explained its contents, and told Saunders that he could refuse consent or stop the search at any time.

36. Saunders signed the form but indicated that he was not the owner of the vehicle.

37. While consent to search the vehicle was being obtained from Saunders, Griggs was in the vehicle reading, or purporting to read, a newspaper; Jankouskas did not believe that Griggs actually was reading the paper.

38. Jankouskas asked Griggs to exit the vehicle and whether there was anything illegal in the vehicle.

39. Griggs said "no" but looked down and turned away from Jankouskas.

40. Jankouskas asked Griggs for consent to search the vehicle and told him that he could refuse consent or stop the search at any time.

41. Griggs signed the form indicating that Jankouskas had consent to search the vehicle.

42. The form is signed by Trooper Rossi as a witness.

43. Saunders and Griggs were "patted down" before their vehicle was searched, but no weapons or contraband was found on their persons.

44. Because he intended to allow his dog to sniff the inside of the Cougar and as part of his search routine, Jankouskas examined the inside of the vehicle for any item which could harm the dog or the odor of which would distract the dog, the latter including such things as food items.

45. Jankouskas removed a bag with three hoagies from the back seat of the vehicle, but noticed that the wrapper was loose on one of the hoagies, as if it had been opened and then re-wrapped.

46. Jankouskas opened the package that appeared re-wrapped and found a white, chunky substance which he believed to be crack cocaine.

47. Both defendants were placed under arrest and read their rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

48. Both defendants indicated that they understood their rights.

49. Saunders made a short statement in response to questions from Jankouskas at the scene of the arrest, but Jankouskas stopped the interrogation when a tow truck appeared.

50. Both defendants were transported to the PSP barracks in Hazleton.

51. Both defendants made statements at the PSP barracks.

## II. STANDARD

Generally, the Fourth Amendment to the Constitution of the United States, applicable to the states through the Fourteenth Amendment, requires probable cause and a warrant before police may make an arrest or conduct a search. *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (*per curiam*); *Dunaway v. New York*, 442 U.S. 200, 207, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). However, under the rule of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may conduct a brief investigatory stop based on a reasonable and articulable suspicion that a particular person has committed, is committing, or is about to commit a crime. *See also Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). A routine traffic stop is analogous to a "*Terry* stop" and therefore also is analyzed under the reasonable suspicion standard. *Id.* (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). *See also United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995) (applying *Terry* standard to motor vehicle stop), *cert. denied*, 518 U.S. 1007, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996); *Commonwealth v. Andersen*, 753 A.2d 1289, 1292–1293 (Pa.Super.Ct.2000) (under Pennsylvania law, "reasonable and articulable" standard applies to stop of a motor vehicle). There is no requirement that a law enforcement officer making a vehicle stop obtain a warrant when there is probable cause to

search the vehicle. *Dyson* at 466–467, 119 S.Ct. 2013.

When there is valid consent, a search is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The prosecution bears the burden of proving that consent was freely and voluntarily given. *Id.* (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)). In *Schneckloth*, the Supreme Court adopted the test for voluntariness of a confession and applied it to the voluntariness of consent to search a vehicle, concluding that the issue is whether the defendant's will was overborne. *Id.* at 225–226, 93 S.Ct. 2041. The issue of voluntariness is a question of fact to be determined from the totality of the circumstances. *Id.* at 227, 93 S.Ct. 2041. A court may consider such circumstances as a defendant's age, education, and intelligence, whether the defendant was advised of his constitutional rights, and whether any questioning was repeated or prolonged. *Telepo v. Palmer Township*, 40 F.Supp.2d 596, 608 (E.D.Pa.1999) (quoting *United States v. Kim*, 27 F.3d 947, 955 (3d Cir.1994), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995)).

## III. APPLICATION TO FACTS OF CASE

In this case, there can be little question that Jankouskas had reasonable suspicion for the stop of the vehicle. The "T" sticker on an older plate suggested that the vehicle was not likely to be registered, and the swerving was a basis for believing that the driver was driving under the influence of alcohol or a controlled substance. *See generally* 75 Pa. Cons. Stat. Ann. §§ 1301, 3731; *Commonwealth v. Starr*, 739 A.2d 191, 195 (Pa.Super.Ct.1999) ("erratic driving" consisting of weaving "three or four occasions" onto solid white line and once onto "side of road"—i.e. berm-sufficient to support stop of vehicle for possible DUI). This conclusion obviates defendants' arguments concerning the purported illegality of the traffic stop, which would make any evidence

obtained in the search "fruit of the poisonous tree" under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Defendants argue, however, that Jankouskas violated their rights under the Fourth Amendment by continuing the detention once he issued the warning to Saunders. While it may seem remarkable that a police officer violates a person's rights by asking for consent to search, an opinion representing the views of three justices of the Supreme Court of Pennsylvania may be read as setting forth just such a rule. *Commonwealth v. Sierra,* 555 Pa. 170, 723 A.2d 644 (1999) *(per curiam ).* The Supreme Court of Pennsylvania undertook in *Sierra* and in opinions discussed below a thorough review and analysis of Fourth Amendment authority from the Supreme Court of the United States, which of course is binding on us. These opinions represent an attempt, rather unique both in scope and exhaustiveness, to synthesize the many principles involved in Fourth Amendment review. In addition, because this court sits in Pennsylvania, and police officers appearing before us, such as Jankouskas, are subject to the law of the state, we have a special interest in the views of the state's highest court on constitutional matters. Therefore, although we are not bound by the pronouncements of the courts of the Commonwealth, we would be remiss if we did not take into account what we view as important opinions on issues before the court.

In *Sierra,* the defendant was a passenger in a car which was stopped for speeding. The police officer conducting the stop noticed that the vehicle had dealer plates, and asked for the driver's license, vehicle registration, and insurance card. The driver complied, but the license had expired. Also, the driver had a gang tattoo under his left eye, the car contained a number of boxed motorcycle parts, and the occupants appeared nervous. The officer asked whether there was anything illegal in the car, and the driver responded in the negative. *Id.* at 645.

In his cruiser, the officer checked the license status and wrote a warning for speeding. He returned to the stopped car, returned the driver's documentation, and had the driver sign the written warning. He asked again if there was anything illegal in the car. The driver said no and asked if the officer would like to check. The police officer said, "Yes, if you don't mind." He then asked the occupants to exit the vehicle for a pat-down search for weapons. A semi-automatic handgun was found in the waistband at the back of the defendant's pants. He later was charged with being a former convict in possession of a weapon and carrying a firearm without a license. *Id.*

The trial court denied a motion to suppress physical evidence and the defendant was convicted after a bench trial. The Superior Court reversed, holding that the police officer had no legitimate basis to continue his inquiry after returning the driver's documentation. Therefore, his second inquiry was unlawful, and the consent and pat-down were tainted. *Id.* The Supreme Court of Pennsylvania affirmed by an equally divided Court.[1]

According to the opinion in support of affirmance,[2] the detention after the return

---

**1.** The order of affirmance was issued *per curiam.* Justice Nigro authored the opinion in support of affirmance, and Justice Castille authored the opinion in support of reversal. Justice Saylor did not participate in consideration of the matter, which is the reason that it was possible for the Court to divide evenly; normally, there would be seven justices considering a case.

**2.** No rule of criminal procedure, appellate procedure, etc., governs affirmance by an ev-

enly divided court, but it is a principle of long standing and wide application. *See Creamer v. Twelve Common Pleas Judges,* 443 Pa. 484, 281 A.2d 57, 58 (1971) *(per curiam ).* There apparently is no clear Pennsylvania authority as to the precedential value of an opinion issued in these circumstances, but it is the practice of the Supreme Court of Pennsylvania to issue an opinion in support of affirmance and in support of reversal when the Court is equally divided. *See, e.g., Creamer; Sierra; Chester County Children and Youth*

of the documentation and issuance of the warning constituted a detention for purposes of *Terry* because the "coercive atmosphere" communicated to the occupants of the vehicle that they were not free to leave. Since there was no reasonable suspicion for the continued detention, the detention was unlawful. *Id.* at 646–647. Finally, the consent to search was "tainted" because: (1) there was insufficient attenuation (in terms of temporal proximity) between the consent and the illegal detention; (2) there were no intervening circumstances to diminish the coercive atmosphere of the illegal detention; and (3) the car was "surrounded by" two police officers at the time of the offer of consent by the driver. *Id.* at 647–648.

In an opinion in support of reversal, Justice Castille pointed out that the plurality opinion necessarily rested on an interpretation of federal case law under the Fourth Amendment. *Id.* at 649 n. 1. He then turned to an analysis of *Schneckloth,* in which a police officer stopped a vehicle at 2:40 a.m. for a violation. When the driver failed to produce a license, the officer ordered the six occupants out and asked if he could search the car. The driver granted permission, and incriminating evidence was found. *Sierra* at 649.[3]

The Supreme Court of the United States concluded that the search was not tainted by any illegality. The stop itself was valid.

While the specific holding in *Schneckloth* is that a state is not required to prove affirmatively that the subject of a search understands that he has the right to refuse, implicit in that holding, according to Justice Castille, is a determination that the question which led to the consent to search had not amounted to an investigative detention. *Sierra* at 650 (citing *Schneckloth* at 229, 227, 231, 93 S.Ct. 2041).

Justice Castille next turned to *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). A police officer stopped the defendant for speeding, obtained the driver's documentation, ran a computer check which showed no previous violation, and asked the driver to exit his car to issue a verbal warning. At that point, the officer returned the driver's documentation and asked if the driver had any illegal contraband in the car. When the driver answered in the negative, the officer asked for consent to search the car. The driver consented, and illegal contraband was found. *Sierra* at 650 (citing *Robinette* at 35–36, 117 S.Ct. 417).

In *Robinette,* the Ohio Supreme Court held that the Fourth Amendment requires that citizens stopped for traffic offenses be informed that they are free to go after the initial detention before the officer may attempt to engage in any further consensual interrogation. The Supreme Court of the United States reversed, stating that

Services v. Cunningham, 540 Pa. 258, 656 A.2d 1346 (1995) (*per curiam*). See also In re G.C., 558 Pa. 116, 735 A.2d 1226 (1999) (*per curiam;* opinion of Zappala, J., joined by two other justices, in support of affirmance; opinion of Nigro, J., in support of reversal; opinion of Newman, J., joined by one other justice, in support of reversal). The Superior Court does not appear to engage in the same practice. *See, e.g., Egnosak v. Bertovich,* 211 Pa.Super. 743, 236 A.2d 233 (1967) (*per curiam;* no opinion). If the Supreme Court of the United States is equally divided, the judgment of the court below is affirmed, and the effect is the same as if no appeal had been taken or if an appeal had been dismissed; an affirmance by an equally divided Court is of no precedential value. *Neil v. Biggers,* 409 U.S. 188, 191–192, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Presumably, the effect of affir-

mance by an equally divided Supreme Court of Pennsylvania would be the same, though the practice of issuing opinions in such an instance seems incongruous with a rule that they have no precedential value.

3. Actually, according to the opinion in *Schneckloth,* when the driver failed to produce identification, the officer asked if any of the other five occupants had evidence of identification. One produced a license and explained that the vehicle belonged to his brother. The occupants exited the vehicle at the officer's request (not order). After two more officers arrived, the original officer asked if he could search the car. The occupant who produced the identification (not the driver) responded, "Sure, go ahead." *Schneckloth* at 220, 93 S.Ct. 2041.

knowledge of the right to refuse consent is one factor taken into account but the prosecution need not prove such knowledge "as the *sine qua non* of an effective consent." It added that an officer does not initiate an investigative detention merely by asking a question of the driver during a routine traffic stop. *Sierra* at 650–651 (quoting *Robinette* at 39, 117 S.Ct. 417; otherwise citing *Robinette* at 36–38, 117 S.Ct. 417).

Also, Justice Castille pointed out that, because the additional intrusion on a passenger in a car which already has been stopped is *de minimis,* ordering a passenger out of the car during a routine traffic stop is not a seizure for Fourth Amendment purposes. *Sierra* at 651 (citing *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)).

Based on these three opinions, Justice Castille (joined by two other Justices), concluded that there had been no Fourth Amendment seizure. *Sierra* at 652.

However, he continued under the presumption that a Fourth Amendment seizure had occurred, comparing the facts of the case to those of *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).[4] In that case, a DEA agent observed a truck traveling in tandem with another automobile in an area under surveillance for drug trafficking. He followed, noting that the truck was riding low in the rear (indicating that it was heavily loaded). He followed for twenty minutes, during which time the vehicles exceeded the speed limit. The DEA agent radioed a state trooper to stop the vehicles. The automobile stopped, but the truck continued. The agent remained with the car while the trooper pursued the truck. Once stopped, the driver of the truck produced a license and bill of sale bearing someone else's name. The driver told the trooper that the truck belonged to a friend and he was taking it to have the shock absorbers repaired. The trooper told the driver that he would be held until the DEA agent arrived. The driver was

nervous and asked for the return of his license so he could leave. The trooper replied that the driver was not free to leave. *Sierra* at 653.

After about 15 minutes, the DEA agent arrived, reviewed the driver's documentation, and told the driver that he thought the truck contained marijuana. The driver twice declined to give consent to a search of the truck. The agent put his nose to the rear window of the truck and reported smelling marijuana. Without permission, he took the keys from the ignition, opened the rear of the truck and found marijuana. The Supreme Court found both that there was ample evidence to support the finding that the officers had a reasonable and articulable suspicion that the vehicles were being used to transport marijuana, and that the 20–minute detention was reasonable under the circumstances which justified the interference. *Sierra* at 653–654 (citing *Sharpe* at 682–683, 105 S.Ct. 1568).

Applying these principles, Justice Castille concluded that the officer in *Sierra* had a more substantial basis for a detention than the agent and officer in *Sharpe,* so that the additional detention was valid under *Terry.* Moreover, the nature of the intrusion was negligible when compared to the intrusion in *Sharpe. Sierra* at 654.

Succinctly stated, we agree with Justice Castille. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citing *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). *See also Robinette* at 39, 117 S.Ct. 417 (citing *Jimeno* ); *Wilson* at 411, 117 S.Ct. 882; *Pennsylvania v. Mimms,* 434 U.S. 106, 108–109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (*per curiam* ). *Cf. United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (general touchstone of reasonableness applies to methods of executing a search warrant). Reasonableness under the Fourth Amendment de-

---

4. Justice Cappy, who otherwise joined in Justice Castille's opinion, wrote separately to dis-

associate himself specifically from Justice Castille's analysis under *Sharpe.*

pends on a balance between the public interest and an individual's right to personal security, free from arbitrary interference by law enforcement officers. *Wilson* at 411–412, 117 S.Ct. 882; *Mimms* at 109, 98 S.Ct. 330. The inquiry is fact-specific and not subject to any bright-line rule. *Robinette* at 39, 117 S.Ct. 417 (also collecting cases).

■ The precise question at this stage of our analysis is whether it is unreasonable for a police officer, after a lawful traffic stop and issuance of a written warning (or citation), and under palpably suspicious circumstances, to ask a question without violating the Fourth Amendment.

We first disagree with the *Sierra* opinion in support of affirmance in its analysis of the question asked after issuance of the citation separate and apart from the traffic stop. We agree that the occupants of a stopped vehicle may be viewed as subject to detention absent being told that they may leave, *see Sierra* at 646 (quoting *Berkemer* at 436, 104 S.Ct. 3138),[5] but disagree that the stages of the detention are separable. That is, the traffic stop and issuance of the warning and citation are not a different detention of the occupants for Fourth Amendment purposes, but are part of the same, continuous detention which began with the routine traffic stop. Thus, continued detention must be supported by facts and circumstances, including those that gave rise to the initial stop plus any further facts and circumstances learned by the officer before issuing the warning or citation. Also, the invasion (i.e., duration and conditions of the detention) must be viewed in the context of the entire stop. However, as discussed at length below, the issue is whether consent given under such circumstances is voluntary, and a detention continued beyond the "endpoint" of a valid initial stop does not necessarily mean that consent obtained at that time is involuntary.

We think that the opinion in support of affirmance in *Sierra* would establish pre-

cisely the kind of bright-line rule eschewed consistently by the Supreme Court of the United States in its Fourth Amendment jurisprudence, and we therefore decline to apply it. Instead, as noted, we agree with Justice Castille that the totality of the circumstances govern, and in this case (as Justice Castille would have done in *Sierra*) a comparison with the facts known by the officer in *Sharpe* leads to the conclusion that the officer here had a more substantial basis for continuing the detention.

In *Sharpe,* the court below had assumed that the officers had an articulable and reasonable suspicion that the defendants were engaged in marijuana trafficking. The Supreme Court found that assumption to be "abundantly supported by the record." *Sharpe* at 682, 105 S.Ct. 1568. The facts were:

> [T]he vehicles [were] traveling in tandem for 20 miles in an area near the coast known to be frequented by drug traffickers.... [P]ickup trucks with camper shells were often used to transport large quantities of marijuana.... [The] pickup truck appeared to be heavily loaded, and the windows of the camper were covered with a quilted bed-sheet material rather than curtains. Finally, both vehicles took evasive actions and started speeding as soon as Officer Thrasher began following them in his marked car.

*Sharpe* at 682 n. 3, 105 S.Ct. 1568. The Court added: "Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification to stop the vehicles and pursue a limited investigation." *Id.*

In this case, the facts were that the Cougar was stopped because of the inconsistency between the "T" tag and older plate, and because of the swerving. Once the car was stopped, the driver failed to produce identification and provided an

---

**5.** Discussed below is the question of whether the occupants *must* be so viewed, a question which the Supreme Court of the United States has answered in the negative.

alias and a false date of birth. The passenger, who purportedly owned the vehicle, provided a registration card for the wrong vehicle. The occupants provided conflicting stories regarding the purpose and duration of their trip. Both showed extreme agitation during the stop,[6] beyond the usual nervousness which might be expected of a driver pulled over by a state trooper. Despite his obviously nervous state, the passenger appeared to be feigning a relaxed state by reading a newspaper.

Given all of these circumstances, we think it entirely reasonable for a police officer to intrude minimally on a driver's personal security and extend a routine traffic stop by the few seconds it takes to ask, "Is there anything illegal in your car?"

█ In addition, we think that there are intervening circumstances which would vitiate any purported taint to the stop and extension of time while the officer asked if there was anything illegal in the car. *Compare Sierra* at 648 (no intervening circumstances which would have diminished coercive atmosphere of illegal detention) *with United States v. Palacios–Suarez,* 149 F.3d 770 (8th Cir.1998) (even if initial stop illegal, search valid if consent sufficiently an act of free will to purge the primary taint), *reh'g en banc denied.* Both Saunders and Griggs signed a consent form acknowledging that the PSP could not conduct the search without a warrant

and that they had a right to refuse the request. Jankouskas explained the form and told Saunders and Griggs that they could deny consent or could stop the search at any time. *See generally United States v. Bates,* 840 F.2d 858, 861 (11th Cir.1988) (defendant who consented to search could not argue that search was unreasonable or beyond scope of probable cause for traffic stop; consent voluntary when defendant advised orally and on form he signed giving consent to search).

Recently, the Supreme Court of Pennsylvania issued two opinions which are more consistent with our reasoning.[7] In *Commonwealth v. Strickler,* 757 A.2d 884 (Pa. 2000), a police officer was on routine patrol when he noticed a vehicle parked along a rural road and two men nearby who appeared to be relieving themselves. The officer stopped to ascertain what was happening and whether anything was wrong. There was a cooler containing unopened beer cans in the car. The men indicated that they were coming from an auto race and had stopped to urinate. The officer obtained their driver's licenses and returned to his own vehicle to check the licenses and to determine whether there were any outstanding warrants for the men. A second officer appeared and parked behind the first. Learning that the licenses were valid and that there were no warrants, the first officer called the owner/driver over, returned his license,

---

6. For the sake of brevity, we described Saunders and Griggs as "very nervous" and "extremely nervous" in our findings of fact. Jankouskas was cross examined at length on this point. He indicated that Saunders continually encroached on his "personal space" in what could be construed as a threatening manner, would not or could not stand still ("pacing in place"), and repeatedly touched his head and face in a nervous manner. Griggs, when he provided his driver's license, "shook uncontrollably."

7. Justice Saylor, who did not participate in the *Sierra* case, is the author of the majority opinion in both *Strickler* and *Freeman,* discussed below. *Sierra* is cited in *Strickler* only as an example of courts having difficulty with

reviewing searches by consent during or after a traffic stop. *Strickler* at 890–91. This may demonstrate that, as we have noted (footnote 2, above), the opinions in *Sierra* have no precedential value except as establishing the judgment of the lower court as the rule of the case.

It is interesting to note, however, that four other justices joined Justice Saylor's majority opinion in *Strickler,* Justice Zappala concurred in the result, and Justice Nigro dissented. In *Freeman,* five other justices joined Justice Saylor's opinion, and Justice Nigro concurred in the result. It appears, then, that Justice Saylor's opinions influenced at least some members of the Court to modify their views as expressed in *Sierra.*

and warned him about his conduct. *Id.* at 886–87.

At that point, the officer thanked him for his cooperation and started back to his own vehicle. After taking a few steps, the officer turned back and asked the owner/driver if he wouldn't mind if the officer took a look through his car. The officer had no reason to suspect that there was contraband in the car. The owner/driver hesitated, looking at both officers. The first officer told him that he did not have to say yes, but asked again if it was OK to search the car. The owner/driver consented, and the officer found a "marijuana smoking pipe." The owner/driver was charged with possession of drug paraphernalia. *Id.*

The trial court ordered the evidence suppressed because, although the initial detention was lawful, the subsequent request to search had been unlawful. The court reasoned that the purpose of the initial detention had been accomplished, so that the request to search was illegal as it was not based on reasonable suspicion or probable cause. Also, the illegality tainted the consent. *Id.* at 887–88.

On appeal by the Commonwealth (the term used for the prosecution in Pennsylvania criminal cases), the Superior Court reversed. It reasoned that the officer's actions prior to the request had communicated clearly to the owner/driver that the detention had ended. Given that the officer had walked away, told the owner/driver that he did not have to consent, and engaged in no other coercive conduct, the Superior Court concluded that there was no unlawful detention and that the consent was therefore voluntary. *Id.*

Relying primarily on Fourth Amendment jurisprudence from the Supreme Court of the United States, *but see id.* at 889 n. 3 (pointing out that state court's own opinions are consistent with the Fourth Amendment and the analogous state constitutional provision, PA. CONST. art. I, § 8), the state Supreme Court distinguished instances in which the initial detention is lawful from illegal stops. If the initial detention is lawful, voluntariness of consent is the exclusive focus for a court reviewing the constitutionality of the search. If the initial detention is unlawful, the government must demonstrate both "a sufficient break in the causal chain between the illegality and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness." *Id.* at 889–90 (citation omitted).

The initial question, then, is whether the citizen has been seized for Fourth Amendment purposes. The Court then reviewed the distinctions between a *"Terry"* stop and an arrest, and the standard for each (discussed above). The test is "whether, in view of all the surrounding circumstances, a reasonable person would have believed that he was free to leave." *Id.* (citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). The focus is on whether there is some show of physical force or authority which restrains the citizen's freedom of movement. *Id.* (citing *Mendenhall* at 553, 100 S.Ct. 1870). The totality of the circumstances approach applies, with no single factor being determinative. *Id.*

Essentially, the defendant's argument was that the initial detention by the first officer was lawful, but that a second detention took place once the officer decided not to cite him and returned his driver's license. *Id.*

The Supreme Court of Pennsylvania next noted the difficulty cases of consent to search after a lawful stop have presented to courts, and turned to an extensive analysis of *Robinette,* including the opinions of the Supreme Court of Ohio. *Strickler* at 890–96. Finding difficulty with the analysis of *Robinette* in that the endpoint of the initial, lawful detention was not identified clearly, the Supreme Court of Pennsylvania concluded that it must have been the point at which the officer returned the driver's documentation and administered the warnings. *Strickler* at 894–97. It agreed with other courts inter-

preting *Robinette* as standing for the following principles: (1) a traffic stop followed by a request for consent is not made up of two separable encounters but one encounter in distinct phases; (2) the endpoint of the initial detention phase is the return of the driver's documentation and issuance of a citation or warning by the officer; (3) a lawful traffic stop may be followed by a consensual encounter; (4) the question of whether the second phase is a consensual encounter entails an examination of the totality of the circumstances, including events before and after the endpoint of the initial detention. *Strickler* at 896–98.

The Court then set forth the factors to be considered, such as: the presence or absence of "police excesses"; physical contact or police direction of the citizen's movements; the demeanor of the officer; the location of the encounter; the manner of expression and content of interrogatories used by the officer; the existence and character of the initial detention, including the coercive impact of the prior display of authority on the continuing encounter. *Id.* at 897–99. The Court also stressed the fact that the "seamless" nature of the transition from investigative detention to consensual encounter must be taken into account, since most citizens would not recognize the transition and would not feel free to terminate the encounter absent a clear endpoint to the investigative detention. A clear statement by the officer in this regard would be a central consideration in assessing the voluntariness of consent given after a traffic stop. *Id.* at 898–900.

In applying these factors, the Court recognized the degree of coercion arising from the prior detention, the fact that the stop was late at night with two police officers present, the two cruisers parked nearby with lights flashing. Balanced against this were such factors as an absence of police excesses, unusual commands, aggressive behavior, or the use of commanding language or tone of voice. That is, "the arresting officer operated well within the boundaries of a typical traffic stop/investigative detention." *Id.* at 899–900. Also, while the officer did not state precisely that the owner/driver and his companion were free to leave, the officer did return his license, thank him, and turned away prior to asking for consent to search. Further, while the fact that there was no express endpoint remains a matter of concern, the officer did nothing after the actual endpoint to suggest independently that his subsequent requests were commands. *Id.* at 900–01. The fact that the officer advised the owner/driver that he was free to refuse consent "counterweigh[ed]" the absence of a statement that he was free to leave. *Id.* at 900–902.

Based on this analysis, the Court concluded that there was no seizure after the endpoint and the request was made during a consensual encounter, and therefore proceeded to a voluntariness analysis. *Id.* at 901–902.

Factors to be considered in assessing the voluntariness of consent include knowledge of the right to refuse consent, as well as the maturity, sophistication, and mental or emotional state of the defendant, including age, intelligence, and capacity to exercise free will. *Id.* "The Supreme Court [of the United States] has also rejected the argument that a defendant's consent is necessarily involuntary where it is given at a time when the defendant knows the search will produce evidence of a crime." *Id.* (citing *Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). Because the test for voluntariness and the test for whether there was a seizure or a consensual encounter after the endpoint of the traffic stop entail an examination of the totality of the circumstances of the entire encounter and their impact on a reasonable person in the position of the citizen, there is an overlap in the analyses, and a finding that there was no seizure weighs heavily in favor of a finding of voluntariness. Once again, the fact that the officer advised the defendant that he was free to refuse consent was "directly

pertinent to establish the voluntariness of [his] consent." *Id.*

The Court concluded that the Commonwealth had established that the defendant was not seized and his consent was voluntary. It added only that its analysis also applied under the Pennsylvania Constitution as well. *Id.* at 902–903.

To be contrasted with *Strickler* is *Commonwealth v. Freeman*, 757 A.2d 903 (Pa. 2000), in which a PSP trooper notice two vehicles on I–80 traveling together, switching lanes, and jockeying for position. He stopped one vehicle while another officer stopped the second. He asked if the driver was lost or having a problem with the other driver. The driver responded that she had entered the wrong lane and was maneuvering simply to continue on her path of travel. She denied that she was traveling with the other vehicle. The trooper obtained her driver's license and registration card and did a radio check. He learned that the occupants of the other vehicle had given statements which contradicted the driver. He returned her documents, gave her a warning, and told her that she was free to leave. He returned to his own car while the other officer continued to question the occupants of the second vehicle. *Id.* at 905–906.

After an unspecified delay, the trooper returned to the vehicle he had stopped and again asked if the driver was traveling with the second vehicle. The driver again denied it, at which point the trooper told her that the occupants of the other vehicle had said otherwise. He asked the driver to exit the vehicle. At the rear of the car, the trooper asked for consent to search, which the driver granted. *Id.* For the sake of brevity, we omit a number of details relating to events occurring during the search. However, the second officer joined the search at the request of the trooper, and they found marijuana in bags removed from the vehicle. The driver and two occupants of her car were arrested and charged with possession of a controlled substance with intent to deliver.

The driver and one of the occupants were found guilty. *Id.*

The Superior Court affirmed the trial court's denial of a motion to suppress. It found that the interaction after return of the driver's documentation was a mere encounter, since the trooper had told the driver that she was free to leave, and consent obtained during such an encounter is valid. *Id.* at 906–907.

Applying the principles enunciated in *Strickler*, the Supreme Court of Pennsylvania reversed. It found that the second encounter was a seizure, based on the surrounding circumstances. These included the trooper's return to the vehicle, questioning of the driver, and pointing out the inconsistencies in the statements of the two drivers. Most importantly, the trooper asked her to step out of the vehicle, a characteristic of a traffic stop as opposed to a consensual encounter. These circumstances would communicate to a reasonable person that any prior advice that the driver was free to leave was no longer operative, and the driver was the subject of a Fourth Amendment seizure. *Id.* at 888–89.

The Court then analyzed whether the second seizure was lawful based on the reasonable suspicion standard, and found that it was not. Basically, the trooper's information was limited to the fact that the vehicles were traveling together and the driver had been evasive about that fact. The paucity of information was in sharp contrast to that available to the DEA agent in *Sharpe*, and had not changed in the time between the two detentions. *Freeman* at 907–908. Given that there was no break in the sequence of events, and the consent could not be said to have been an independent act of free will but a product of the illegal detention, the fruits of the search were ordered suppressed. *Id.* at 909.

Consistent with *Strickler* and *Freeman* is *United States v. D'Armond*, 80 F.Supp.2d 1157 (D.Kan.1999).

As stated above, we are of the view that *Robinette* stands for the proposition that a reviewing court looks at all of the circumstances of the stop, from its inception through the consent, to determine whether the officer's conduct was reasonable and whether the driver's consent was voluntary. As noted by the Supreme Court of Pennsylvania, the Supreme Court of the United States did not engage in a discussion of whether the driver was seized for Fourth Amendment purposes, leading to criticism of the *Robinette* opinion. *Strickler* at 894–95. The primary basis for this criticism appears to be that the Court in *Robinette* stated that it was addressing the question of the "continuing legality of the detention" as a predicate to resolution of the question presented. *Strickler* at 894–95; *Robinette* at 38, 117 S.Ct. 417. We think this criticism itself to be misdirected.

The question presented in *Robinette* was "whether the Fourth Amendment requires that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary." *Id.* at 35, 117 S.Ct. 417. The Court noted that the respondent (Robinette) had argued that it could not reach this question because the Supreme Court of Ohio ruled that the stop was illegal at the point the police officer asked Robinette to get out of his car after deciding not to give him a ticket. That is, the subjective purpose behind the stop had changed, and there was no reasonable suspicion to support the officer's actual purpose. The Supreme Court first noted that Robinette had not argued in his brief in opposition to *certiorari* that the officer's subjective state of mind rendered the seizure unlawful, but that consideration of the issue was a predicate to intelligent resolution of the question presented. Based on *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Court held that the officer's subjective intent was immaterial to ordinary Fourth Amendment analysis. *Robinette* at 38, 117 S.Ct. 417.

In other words, placed into context, the Supreme Court's statement regarding the lawfulness of the continuing detention refers not to whether the request to consent was asked during a valid stop or consensual encounter, or to a change in how the stop was to be characterized, but to whether the stop had been rendered unlawful by the officer's change in purpose.

Of course, this does not address the criticism completely, as it remains true that the Supreme Court undertook no analysis concerning whether there was a seizure at the time that consent was obtained. We think that the reason for this is obvious from a reading of *Robinette:* The Court was examining the voluntariness of the consent, and went straight to that analysis. The Court assumes a valid stop, i.e. the initial detention. Therefore, the question of whether there was a seizure at the time that consent was obtained is not a *predicate* under the circumstances presented because the initial detention was lawful; rather, whether the citizen is subject to a seizure is a *factor* to be considered when analyzing whether the consent to search is voluntary.

Stated differently, while it is true that consent obtained after an unlawful stop must be suppressed, *see generally Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)(Fourth Amendment required suppression of evidence obtained as a result of stop of vehicle without articulable and reasonable suspicion); *United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir.)(evidence obtained as a result of a constitutional violation may not be used at trial), *cert. denied,* —— U.S. ——, 120 S.Ct. 72, 145 L.Ed.2d 62 (1999), that general principle may not apply when the initial stop was lawful. The reason is that the entirety of the interaction between the police and the citizen is unreasonable when the initial stop violates the Fourth Amendment absent intervening circumstances which purge the taint of the initial stop. *Cf. Pelullo* at 136 (collecting cases and recognizing that evidence may be admissible under exceptions to exclusionary rule if causal link between consti-

tutional violation and evidence is tenuous or nonexistent).

In this context, we also note the inconsistency between the stated principle that there are no separate stops or seizures for Fourth Amendment purposes, but different phases of one encounter, and an analysis which establishes an "endpoint" to a valid stop and beginning of a consensual encounter. Both logically and as a practical matter, the "phases" are being treated as separate encounters or seizures, regardless of how each is characterized.

Assuming, however, that *Strickler* is the correct reading of *Robinette,* we believe that the circumstances of this case are closer to *Strickler* than to *Freeman,* and that the factors identified in those cases weigh against suppression. We must presume, of course, that Griggs and Saunders were "seized" after Saunders signed the warning by Jankouskas. While there was no clear change in circumstances which would have indicated to Griggs and Saunders that the encounter had changed from a traffic stop to a consensual encounter, they each were informed at least twice, once orally and once in writing, that they could refuse to give consent to the search. In conjunction with their sophistication (arising from prior contacts with the police),[8] age, etc., we think that this repeated information clearly supports a finding that the consent was voluntary.

### IV. COERCION

Saunders and Griggs also contend that they were coerced to sign the consent form. As noted above, the question in such an instance is whether a defendant's will was overborne. *See Schneckloth* at 225–226, 93 S.Ct. 2041. Neither Saunders nor Griggs testified that they subjectively felt that there was a threat of official action to the extent that they had no choice but to give consent. Instead, they testified that each thought only the other could give consent. That is, Saunders tes-

tified that he thought only Griggs, as owner of the Cougar, could consent to the search, while Griggs testified that only Saunders, as driver, could consent to the search. Jankouskas also testified that Saunders told him that it was not his (Saunders') car. Neither explained why they thought a police officer would ask them for consent if they could not give it.

Moreover, we do not think that the circumstances are such that the consent was the product of coercion or duress. *See Bostick* at 438, 111 S.Ct. 2382 (consent must be free of coercion or official intimidation and harassment); *Bolden v. SEPTA,* 953 F.2d 807, 824 (3d Cir.1991) (whether consent to search is voluntary is a question of fact to be determined from the totality of the circumstances), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992). Jankouskas never told Saunders and Griggs that they had to submit to the search or that a warrant could be obtained in the absence of consent. *Bolden* at 824 (claim of authority to search without consent weighs against finding of voluntariness). The only colorable argument raised by defendants in this respect is that the presence of a number of officers at the scene was intimidating.

Saunders testified that, at most, there were three PSP cruisers at the scene. Jankouskas agreed that there may have been as many as three, but that one would have been a corporal stopping briefly in passing by, simply to make sure that the officers at the scene were all right. The diagram prepared by Saunders and his counsel at the hearing is consistent with this testimony. The diagram shows the Cougar stopped on the berm with Jankouskas' cruiser behind it, and Rossi's vehicle to the right (according to Saunders, on the grass beside the road). A third vehicle is to the left of defendants' and Jankouskas' vehicles, or in an area that would have been the right lane of traffic.

---

**8.** Another sign of defendants' sophistication is the cleverness with which the crack was hidden. We think it highly unlikely that most police officers would have noticed the opened hoagie wrapper. It was only because a canine unit involved, giving rise to the extra attention to food, that the crack was discovered.

This arrangement of vehicles is consistent with Jankouskas' testimony, and neither defendant testified that traffic was stopped or limited to the left lane of travel during the stop. Moreover, no witness testified that any trooper besides Jankouskas and Rossi exited their vehicle at the scene of the stop. We conclude, then, that the presence of the third PSP vehicle was a brief stop by another member of the PSP to survey the scene, and nothing more.

Saunders also testified that he knew there was a dog in Jankouskas' vehicle. It is difficult to see how Saunders would have seen the dog past the headlights in an unlit car, at night, when the cruiser had "limousine-tinted" windows. Also, neither defendant testified that the dog made any noise, and Jankouskas explained that the dog (a black Labrador retriever weighing about 68–70 pounds) was not cross-trained in "handler protection" or "bite work," but solely in drug detection. For his part, Griggs did not testify that he was even aware of the dog, and his remaining in the Cougar would give him no opportunity to observe the dog. It also is important to note that the dog remained in the cruiser during the entirety of the traffic stop. We conclude that the presence of Jankouskas' dog could have had little or no effect on the decision making process of Saunders and Griggs.

Further, Jankouskas testified that he may have had his hand on his gun when he initially approached defendants' vehicle. He did not draw the weapon, and neither Saunders nor Griggs testified that they saw Jankouskas touch the weapon in any sort of threatening manner. We conclude that any touching of the weapon had no effect on the decision making process of Saunders and Griggs.

Both defendants could read and both signed the consent form (indicating ability to write). Both defendants are in their forties (Saunders is 48 and Griggs is 43), and neither is a novice with respect to contact with the police and the criminal justice system. Both the consent form and Jankouskas, personally, informed them that they could refuse consent to the search or could stop it at any time.

Based on our consideration of all of these circumstances, we conclude that the consent given by Saunders and Griggs was voluntary, and not the product of coercion or duress.

## V. DEFENDANTS' OTHER ARGUMENTS

Although the foregoing analysis addresses the primary issues related to the suppression motion, defendants have raised a number of arguments which also require discussion. Primary among these is the repeated allegation that race played a determinative role in the stop of defendants' vehicle. In an unnecessarily sarcastic brief, Griggs refers to being stopped for "DWB," or "Driving While Black." Griggs' Brief in Support of Motion to Suppress at 4. Consistent with that view, both Griggs and Saunders refer at length to what they contend must have been going through Jankouskas' mind and whether it was consistent with his actions.

As an example, Jankouskas testified that one of the reasons that he stopped the vehicle was that repeated swerving onto the berm is an indication of potential driving under the influence of alcohol or a controlled substance. We (and the Pennsylvania courts) agree.

However, Griggs and Saunders point out that Jankouskas did not smell alcohol or marijuana,[9] and did not conduct field sobriety tests.[10] These arguments

---

**9.** Jankouskas would have smelled alcohol or marijuana only after the stop already had been made.

**10.** The absence of an odor indicating alcohol or marijuana would explain why field sobriety tests were not conducted, and the failure to produce a license or registration would explain the change in focus. Regardless, the cause of the initial detention was the swerving and the "T," and it is the facts then known to Jankouskas that are relevant. Events which occur, or knowledge which is gained, thereafter do not change the quantum of information

are completely devoid of merit: As the Supreme Court of the United States has made clear, an officer's subjective intent in making a traffic stop is irrelevant to the analysis of whether the stop is objectively reasonable. *Whren* at 813, 116 S.Ct. 1769. *See also Whren* at 811, 116 S.Ct. 1769 ("...only an undiscerning reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred").

In addition, as the Supreme Court of Pennsylvania noted, arguments concerning any purported practice of stopping minority drivers is subject to Equal Protection or Due Process analysis, not Fourth Amendment analysis. *Strickler* at 902 n. 28.[11] As in that case, no evidence was presented to support such a claim in this court.[12]

We are limited, then, to consideration of the issue as a matter of credibility. That is, do we think that Jankouskas observed the events as he testified, or did he make it up in order to justify the traffic stop? As we have noted, a reading of our findings of fact reveals that we have resolved questions of credibility in favor of Jankouskas, and we have done so for a number of reasons.

According to Griggs and Saunders, they were driving along I–80 with their overhead lamp on because Griggs was reading the *Philadelphia Daily News.* While the light would give Griggs the ability to read and would illuminate the occupants of the car, it also would reduce visibility because the car's windows would reflect the internal light. Yet Griggs and Saunders claimed that they both clearly saw the cruiser parked in an area off to the side of

the road when they passed it. Further, Griggs allegedly saw the cruiser despite his preoccupation with the newspaper.

Once they were stopped, neither Griggs nor Saunders objected to the stop based on the swerving. That is, neither testified that they told Jankouskas he was wrong, that they never swerved. Instead, they accepted the warning without objection, with Saunders even signing the warning.

Finally, Saunders reminds us that Jankouskas' discovery of the crack is not supposed to be a factor in our determination as to whether there was a valid traffic stop. While we agree generally with that principle, it does not follow that the discovery of the crack is completely irrelevant to our determination, as Saunders contends. If the motion to suppress is denied, and defendants are convicted, they face lengthy jail terms, an obvious motivation for providing testimony favorable to having the motion suppressed. That is, the discovery of the crack and the resulting charges are relevant to the defendants' credibility.

With respect to Jankouskas' testimony, we found it consistent with the reports written shortly after these events and internally consistent. Any shortcomings in Jankouskas' testimony represented lapses in memory or simply the manner in which questions were asked.

Saunders provides as exhibits the opinions of two courts, one suppressing and the other affirming the suppression of the results of searches by Jankouskas. The first is *Commonwealth v. Benzo,* No. 395 Criminal 1994 (Monroe County 1994), *aff'd,* 671 A.2d 766 (Pa.Super.Ct.1995)(table), *alloca-*

---

available to an officer at the time a stop is made.

**11.** The Supreme Court of Pennsylvania also noted that it could address the claim under its supervisory powers. *Id.* Of course, federal courts have no supervisory powers over state courts or police, *Dickerson v. United States,* ─── U.S. ───, ───, 120 S.Ct. 2326, 2333, 147 L.Ed.2d 405 (2000) ("It is beyond dispute that we do not hold a supervisory power over the

courts of the several States"), so that such a claim may not be raised in this court.

**12.** Saunders' motion refers to the stop as "unconstitutional" without reference to any particular clause. However, his brief refers specifically to the Fourth Amendment, and the argument is based entirely thereon. Equal Protection and Due Process analysis is neither identified as a basis for the motion, nor is there any argument based on either clause.

*tur denied,* 675 A.2d 1242 (Pa.1996)(table). Saunders first purports to be using the opinion to support a contention that Jankouskas in the past had monitored traffic from the median of I–80. Saunders' Supplemental Brief in Support of Motion to Suppress at 2 n. 1. Jankouskas never testified that he had not done so; in fact, he specifically testified that he had monitored traffic from the median, so there is no reason to impeach Jankouskas on that point.

Saunders next uses the *Benzo* opinion because the Superior Court, affirming the suppression, made a comment about Jankouskas' subjective intent. Saunders' Supplemental Brief in Support of Motion to Suppress at 12 n. 6. No copy of the Superior Court's opinion is provided, so that we cannot examine the context of the comment. Further, the opinion is unpublished, meaning that it is *not* intended for use by any other court. Pa.Super. Ct. I.O.P., § 65.37.A. And last, the Superior Court's view of Jankouskas' subjective intent is irrelevant under *Whren.*

Saunders' last citation to *Benzo* is to the effect that "similar factors," i.e. indications of nervousness, had not been considered by the Court of Common Pleas as sufficient to give rise to reasonable suspicion to request to search. Saunders' Supplemental Brief in Support of Motion to Suppress at 28 n. 9. As discussed at length above, there must be reasonable suspicion to conduct the stop and consent given thereafter must be voluntary; there is no requirement of reasonable suspicion to ask for consent.

Saunders cites *Commonwealth v. Santiago,* 01487 Philadelphia 1996, slip op. at 5 n. 4 (Pa.Super.Ct.1997),[13] because Jankouskas' credibility was questioned and the stop was similar to that in the instant case. Again, it is improper to cite an unpublished opinion of the Superior Court. IOP § 65.37.A.[14] Further, that a witness' credibility was questioned in another case has nothing to do with his credibility in this case. Finally, the questioning of Jankouskas' credibility is itself somewhat dubious, since it relates to his subjective intention to obtain consent to search, a matter which is irrelevant under *Whren.*

Saunders also cites *Santiago* in support of his contention that nervousness "factors" had been rejected in other cases of stops by Jankouskas. Our view is the same as we have discussed for *Benzo.*

We think the transparent purpose of providing us with copies of *Benzo* and *Santiago* is to impugn the credibility of Jankouskas. This approach is improper, as any impeachment material which is properly considered for that purpose should have been presented as the subject of cross-examination at the evidentiary hearing. *See generally* Fed.R.Evid. 607, 608(b).

We also would note what we view as flawed reasoning in both cases. In *Benzo,* the court held that the officer could not lawfully ask any question of the driver once he issued a warning or citation. Under the authorities we have discussed above, that is not the law. In *Santiago,* the Superior Court held that the officer's

---

**13.** The comment to which we have referred above and which Saunders attributes to the Superior Court affirming the trial court in *Benzo* appears to be a mis-citation, since the same comment appears in *Santiago* at 5 n. 4. Our view of the use of the comment applies in either instance.

Also, although we use the case name as cited by Saunders, we note that the proper citation should be *Commonwealth v. Brown,* as the first name appearing in the caption. However, the table disposition of the case appears as *Commonwealth v. Parker,* 707 A.2d 551 (Pa.Super.Ct.1997)(table).

**14.** A more analogous unpublished opinion is *United States v. Rodriguez,* 9 (10th Cir.2000)(table; text available at 2000 WL 639581). In that case, after being issued a verbal warning, the driver indicated to the officer that the officer would need to obtain consent to search the vehicle from the passenger. The officer received consent, and the Tenth Circuit held that the consent was valid. *But see* Tenth Circuit Local Appellate Rule 36.3(b) (citation to unpublished decisions disfavored, unless it is persuasive with respect to issue not addressed in published opinion and assists with disposition of case at hand).

decision not to ticket the driver "dissipated" the justification for the stop. Under *Whren*, that is not the law.

We conclude that neither *Benzo* nor *Santiago* is of any practical use for present purposes and will not rely on either for any purpose.

One further point we believe should be mentioned. Saunders claims that he gave the correct name but that Jankouskas did not hear him correctly. Even if that were the case, it is the facts known to Jankouskas which are to be considered. Regardless, the mistake/intentional misstatement has no bearing on our analysis.

Based on our crediting of the testimony of Jankouskas, there are facts supporting a reasonable and articulable suspicion which justified the initial detention of defendants' vehicle, and the consent to search obtained thereafter was valid.

### VI. CONCLUSIONS OF LAW

1. A brief, investigatory detention must be based on a reasonable and articulable suspicion that criminal activity is afoot.

2. A routine traffic stop is analogous to a brief, investigatory stop and subject to the reasonable suspicion standard.

3. On February 29, 2000, Jankouskas had a reasonable and articulable suspicion justifying the stop of the vehicle driven by Saunders and owned by Griggs.

4. The question asked of Saunders by Jankouskas as to whether there was anything illegal in the vehicle was reasonable and did not violate the Fourth Amendment.

5. Saunders and Griggs gave valid consent to search the vehicle, and the consent was not the product of duress or coercion.

6. The search did not violate the Fourth Amendment.

7. Any evidence obtained as a result of the search, including both the crack cocaine found in the hoagie wrapper and any statements made by Saunders and Griggs, are not subject to exclusion under the Fourth Amendment.

### VII. CONCLUSION

The motion to suppress evidence will be denied. An order consistent with this memorandum will issue.